**MOUNT WASHINGTON TANKER COMPANY, a subsidiary of Victory Carriers, Inc., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 81–10.**

United States Court of Customs and Patent Appeals.

Nov. 25, 1981.

---

John S. Rode and David C. Williams, New York City, for appellant.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Joseph I. Liebman, Atty. in charge, and Madeline B. Kuflik, New York City, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

BALDWIN, Judge.

This is an appeal from a decision of the United States Court of International Trade [1] in which the phrase "repairs made in a foreign country" appearing in 19 U.S.C. § 1466(a) [2] was construed, apparently for the first time. On the facts presented, the Court of International Trade concluded, *inter alia*, that the routine ship repairs on board appellant's oil tanker while it was on the high seas by employees of a Swedish corporation hired for the task were "made in a foreign country" within the meaning of § 1466(a) and that the costs of such repairs were subject to the 50% duty imposed by statute. We affirm.

---

1. *Mount Washington Tanker Co. v. United States*, 505 F.Supp. 209 (1980), hereinafter "slip opinion."

2. The relevant portion of § 1466(a) is abstracted below:

§ 1466. *Equipment and repairs of vessels—Vessels subject to duty; penalties*

(a) The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials *to be used*, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country.

## Background

There is no dispute between the parties over the pertinent facts, which can be summarized briefly. Appellant operates the oil tanker T/S MOUNT WASHINGTON, a vessel of U.S. registry. In 1968 the MOUNT WASHINGTON was under charter to deliver oil between various Pacific Ocean ports. During this period, the MOUNT WASHINGTON required certain routine repairs, primarily to the tanker's electrical generator. Pursuant to a preexisting agreement between appellant and Nicoverken, AB (Nicoverken), a Swedish corporation,[3] electricians and fitters employed by Nicoverken were flown from Gothenburg, Sweden, to the Philippines, to make the repairs on board the MOUNT WASHINGTON. After signing on as crewmen, the Swedish workers began the repairs on March 30, 1968, completing them on May 12, 1968, at a total cost, including labor, transportation, and material, of $11,122.61. In the meantime, appellant's tanker was within the borders of a foreign country (either the Philippines, Singapore, or Bahrein) for a total of approximately nine days, the rest of the time being spent at sea.

When the MOUNT WASHINGTON returned to the United States, docking in Honolulu, the Customs Service assessed duties on the expenses of the repairs made by the Nicoverken employees, including in its computation of duties the expenses incurred by appellant for repairs performed both in foreign port and at sea. When its petition for remission of the duty was denied, appellant brought the present action, alleging primarily that the Customs Service had improperly included in the dutiable amount the cost of repairs performed in international waters and not "in a foreign country," as required by § 1466(a).

After considering the legislative history of § 1466, the trial court held that the dutiable amount must include the costs of repairs made both in foreign port and on the high seas. Before us, appellant advances three grounds for reversing the trial court's decision. First, as a matter of law, ships at sea and the property on them remain within the country of registry; consequently, on-board repairs to a U.S. registered vessel in international waters are technically performed in the United States rather than "in a foreign country." Second, well-recognized tenets of a statutory construction and the applicable case law alike require that "foreign country" be given its "common meaning," said to connote a sovereign territory. Third, even if reference to the legislative history is deemed necessary (and appellant does not concede this) the background material on § 1466(a) indicates only that Congress intended the protection afforded by § 1466(a) to extend solely to direct competition from foreign shipyards *per se*.

## OPINION

As a preliminary issue, we must decide whether it is appropriate for us now, in construing "repairs made in a foreign country," to look behind the language of § 1466(a) to ascertain the underlying congressional intent. In their briefs, the parties have cited case law as authority both for and against the proposition that the phrase "foreign country" has some "common meaning" which is more or less divorced from the particular statutory context in which it appears. However, we agree with the trial court that no common meaning for "foreign country" can be abstracted from these cases.

Moreover, we are not persuaded that *Procter & Gamble Mfg. Co. v. United States*, 60 Treas.Dec. 356, T.D. 45099 (1931), 19 CCPA 415, T.D. 45578, *cert. denied*, 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546 (1932), and its progeny[4] compel the conclusion that a meaning for "foreign country" in § 1466(a) must be adopted from admiralty law, as appellant contends. In *Procter &*

---

3. More specifically, the Swedish repair team was provided by Nicoverken through its U.S. agent, Wilson Walton International, Inc. of New Jersey, with whom appellant contracted.

4. See *William Camp Co. v. United States*, 70 Treas.Dec. 611, T.D. 48623 (1936); *Doremus Fisheries v. United States*, 61 Treas.Dec. 960, T.D. 45642 (1932).

*Gamble*, the Customs Court (now the U.S. Court of International Trade) had denied a protest of a duty on the value of imported oil obtained from whales caught in the Ross Sea, Antarctica, and processed on board a Norwegian vessel in international waters. In disallowing protestor's claim that the whale oil was not imported from a "foreign country," and therefore was not dutiable under applicable tariff provisions, the Customs Court looked first to legislative purpose, concluding that Congress' intention to raise revenue on whale oil produced within foreign territorial limits was logically inconsistent with exempting from taxation oil produced on the high seas in a foreign vessel. In support of its decision, the Customs Court in *Procter & Gamble* cited, among others, authority dating from the previous century to the effect that vessels on the high seas are subject to the jurisdiction of the state to which they belong, i. e., they are in a sense extensions of that state's sovereignty.

Appellant argues that this latter rationale of the trial court in *Procter & Gamble* provides a definitive interpretation of "foreign country," as applied in cases, including the present one, generally concerned with the legal disposition of conduct in international waters. However, appellant has read *Procter & Gamble* too broadly, and in so doing, loses sight of the trial court's basic point of reference, congressional intent. Analogies to admiralty law, however appropriate an aid to interpreting another statute under a completely unrelated fact pattern in order to implement a different legislative policy,[5] are not necessarily relevant

to, let alone binding upon, our deliberations here.[6]

In line with the foregoing, we note the statement of Chief Justice Hughes, made in a somewhat different context, that "[t]he term 'foreign country' is not a technical or artificial one, and the sense in which it is used in a statute must be determined by reference to the purpose of the particular legislation." *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 6, 52 S.Ct. 275, 277, 76 L.Ed. 587 (1932) (footnote omitted).[7] Accordingly, we must look to the legislative history of § 1466(a) to discern the nature of the protection which Congress intended to provide, and which we are obliged to effect. *See, e. g., Sandoz Chemical Works v. United States*, 43 CCPA 152, C.A.D. 623 (1956).

The statutory background to Section 466 of the Tariff Act of 1930 (now 19 U.S.C. § 1466) was considered in *United States v. Gissel*, 353 F.Supp. 768, 772 (S.D.Tex.1973), aff'd, 493 F.2d 27 (5th Cir. 1974). The federal district court in *Gissel* stated:

The Tariff Act of 1930 included within its formal title the following purpose: "An Act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, to protect American labor, and for other purposes." 46 Stat. 590 (1930). This statute provides for the imposition and collection of customs duties upon entry of various foreign merchandise into the United States. Since foreign repair parts on vessels were generally thought of and classified as dutiable merchandise

---

5. The purpose behind the tariff provision construed in *Procter & Gamble* was the raising of revenue. In contrast, the predominant legislative goal underlying § 1466(a) is to encourage U.S. shipowners to have their repair work done by U.S. labor. See note 8 infra, and associated text.

6. Notably, in upholding the trial court's judgment in *Procter & Gamble*, this court strongly emphasized the need to interpret "foreign country" in light of legislative intent; no mention of analogies to other legal principles was made.

7. The issue considered by the *Burnet* Court was whether taxes levied by the State of New South

Wales, a political subdivision of the Commonwealth of Australia, were paid "to any foreign country" within the meaning of the 1921 Revenue Act's foreign tax credit provision. Appellant attempts to dismiss *Burnet*, as well as the other decisions cited by appellee, on the ground that "foreign country" was not considered in any context similar to that presented in this case. Appellant thus overlooks the significance of *Burnet* and the other decisions as indicators of judicial willingness to adapt the interpretation of "foreign country" to the circumstances and legislative concerns extant in a particular case.

and since it was Congressional policy to encourage the obtaining of American flag vessel repairs in American shipyards, such repairs were expressly included as dutiable merchandise within a provision of the Tariff Act. The tariff law has contained such a provision in substantially the same form since the enactment of section 23 of the Tariff Act of 1866, 14 Stat. 183 (1866).

The predecessor to the United States Court of International Trade subsequently elaborated the analysis of the *Gissel* court, concluding:

> It is clear that the purpose of section 1466(a) was to protect the American shipbuilding and repairing industry. *United States v. Gissel*, 353 F.Supp. 768, 772 (S.D.Tex.1973), *aff'd*, 493 F.2d 27 (5th Cir. 1974). In addition to noting the Congressional purpose of the statute, in *Suwannee Steamship Company v. United States*, 435 F.Supp. 389, 394, 79 Cust.Ct. 19, 26, C.D. 4708 (1977), this court stated that:
>
> > "Both the hearings of the Senate Committee, and the committee's final report on section 466, evidence the concern of the committee members that the House amendment would have provided insufficient protection for American shipyards, the class for whose benefit the section was originally formulated. *See Senate Hearings on H.R. 2667.* 71st Cong., 1st Sess., Vol. XVII at 537–46 (1929). S.Rep.No. 37, 71st Cong., 1st Sess. 72 (1929)."

*Erie Navigation Co. v. United States*, 83 Cust.Ct. 47, C.D. 4820, 475 F.Supp. 160, 163 (1979).

The trial court, taking its lead from the *Gissel, Erie* and *Suwannee* opinions, stated (slip opinion at 17–18):

> That labor was also included in the protection afforded the domestic shipbuilding and repair industries is fully supported by the legislative history of section 1466 and its predecessor provisions. During Congressional hearings on H.R. 2667, which became the Tariff Act of 1930, the report of the House Ways and Means Committee stated:

> > "The *labor cost* in production *is an essential factor.* The average rate of wages abroad is 40 percent or less than that in the United States. While the effectiveness of foreign labor is increasing, their wage scales have not increased in proportion. This creates a serious situation not only for the manufacturer *but for the laborer.*" H.R. Rep.No. 7, 71st Cong., 1st Sess. 4 (1929). (Emphasis added.)

> *See also Hearings Before the Committee on Ways and Means of the House of Representatives, Tariff Readjustment— 1929,* 70th Cong., 2d Sess. (1929), Vol. XVI, p. 10290. It should also be noted that one of the expressly stated purposes of H.R. 2667 was "to protect American labor."

Appellant seeks to qualify the trial court's characterization of the congressional purpose of § 1466(a), citing "evidence in the legislative history that the Congress intended to protect American labor, but only as a component of the United States shipyard industry." Accordingly, appellant concludes "the Congress was concerned with *shipyard* labor when it enacted the statute. Since the physical facilities of a shipyard are obviously located ashore, the Congress chose physical site of the repairs as the criterion for determining dutiability." (Emphasis in original.)

We find appellant's argument too narrowly drawn in light of Congress' clear intention to equalize, by imposition of the prescribed duty, the relative costs of repairs performed by foreign versus domestic labor, in order to encourage U.S. shipowners to employ U.S. labor whenever possible. It may be true, as appellant asserts, that in § 1466(a) Congress has struck a balance between competing groups (U.S. shipowners and shipyards, respectively) which represents "a limited circumscribing of the interests of * * * shipowners in favor of * * * shipyards," and that we should not so construe § 1466(a) as to upset this balance by unduly burdening U.S. shipowners. Nevertheless, we fail to see how an interpretation of § 1466(a) that encourages shipowners, as

Congress intended, to employ U.S. labor to effect repairs, save in certain well-defined circumstances,[8] *a priori* imposes a heavier burden on shipowners than can be justified by reference to the statute.

Appellant has urged that the trial court improperly substituted worker nationality for the situs criterion Congress intended should be the touchstone for dutiability. However, we do not read the trial court's opinion as enunciating so mechanical a test. Rather, the trial court concluded that the legislative purpose of § 1466(a) would be frustrated if those costs incurred when appellant chose to forego available U.S. labor[9] and to have routine repairs performed on board by workers hired as a special repair crew from a foreign country were declared non-dutiable.

 We fully concur in the judgment of the trial court on this point. Appellant availed itself of foreign labor to the detriment of the U.S. workers that Congress sought to protect. Therefore, "repairs made in a foreign country" in § 1466(a) must be interpreted to comprehend the repairs made to appellant's vessel in international waters.

### Conclusion

The judgment of the United States Court of International Trade is *affirmed.*

8. Congress has indicated quite clearly the circumstances under which duties paid on repair costs may be remitted. For example, the Secretary of the Treasury is authorized to refund duties paid if the repairs are compelled by stress of weather or other casualty and are prerequisite to the vessel's seaworthiness, 19 U.S.C. § 1466(d)(1), or are performed by U.S. residents or regular crewmembers, 19 U.S.C. § 1466(d)(2).

9. Appellant has conceded that American shipyards can perform onboard repairs, in competition with foreign ship-building and repair corporations like Nicoverken.