FRONTIER DITCH COMPANY,
Applicant–Appellant,

v.

SOUTHEASTERN COLORADO WATER CONSERVANCY DISTRICT; Amity Mutual Irrigation Company; Arkansas Valley Ditch Association; Robert W. Jesse, Division Engineer and Jeris A. Danielson, State Engineer, Objectors–Appellees.

No. 87SA106.

Supreme Court of Colorado,
En Banc.

Sept. 12, 1988.

As Modified on Denial of Rehearings Oct. 11, 1988.

Robert F.T. Krassa, P.C., Robert F.T. Krassa, Pueblo, for applicant-appellant.

Fairfield & Woods, P.C., Howard Holme, Kevin B. Pratt, Stephen H. Leonhardt,

Denver, for objector-appellee Southeastern Colorado Water Conservancy Dist.

Shinn Lawyers, Carl M. Shinn, Lamar, for objector-appellee Amity Mut. Irr. Co.

Mitchell & Mitchell, P.C., Rexford L. Mitchell, Rocky Ford, for objector-appellee Arkansas Valley Ditch Assn.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Wendy C. Weiss, First Asst. Atty. Gen., Denver, for objectors-appellees State Engineer and Div. Engineer for Water Div. No. 2.

QUINN, Chief Justice.

This appeal requires us to determine whether Article VI of the Arkansas River Compact, § 37–69–101, 15 C.R.S. (1973), prohibits a Colorado water court from exercising jurisdiction over the Frontier Ditch Company's application for a determination of a water right based on the Frontier Canal's diversion of water in Colorado from tributaries of the Arkansas River for the purpose of irrigating lands located entirely in Kansas. The water court dismissed the application, holding that the Compact deprived it of jurisdiction to adjudicate the application. We affirm the judgment of the water court.

## I.

The Arkansas River, which has its origin in the central mountains of Colorado near Leadville and flows eastward onto the western plains of Kansas, has been the source of much controversy over the years between Colorado and Kansas. *See Colorado v. Kansas*, 320 U.S. 383, 64 S.Ct. 176, 88 L.Ed. 116 (1943) (original suit by Colorado against Kansas and Kansas user of Arkansas river water resulting in decree enjoining further prosecution of suits by Kansas user against Colorado users and denying further relief to both states). In an effort to resolve these continuing controversies, a Compact Commission composed of representatives of Colorado, Kansas, and the United States was convened in 1946, pursuant to article I, section 10 of the United States Constitution, for the purpose of negotiating an interstate compact. The

Arkansas River Compact (Compact) became effective in 1949 when it was ratified by the legislatures of both states and approved by the United States Congress.

The major purposes of the Compact include: first, the settlement of existing disputes and the removal of the causes of future controversy between Colorado and Kansas concerning the waters of the Arkansas River and their control and utilization for irrigation and other beneficial purposes; and second, the equitable division and apportionment between Colorado and Kansas of the waters of the Arkansas River and their utilization as well as the benefits arising from the John Martin Reservoir. § 37–69–101, Art. I, 15 C.R.S. (1973). The provisions of the Compact are based on the following three considerations: (1) the physical and other conditions peculiar to the Arkansas River and its natural drainage basin, and the nature and location of irrigation and other developments and facilities in connection therewith; (2) the decision of the United States Supreme Court in *Colorado v. Kansas*, 320 U.S. 383, 64 S.Ct. 176, 88 L.Ed. 116, concerning the relative rights of Colorado and Kansas in the use of the waters of the Arkansas River; and (3) the experience between the two states under various interim executive agreements apportioning the waters released from the John Martin Reservoir as operated by the Corps of Engineers. § 37–69–101, Art. II, 15 C.R.S. (1973). The term "waters of the Arkansas river" as used in the Compact means "the waters originating in the natural drainage basin of the Arkansas river, including its tributaries, upstream from the stateline." *Id.* § 37–69–101, Art. III B.

The Frontier Canal, which since 1895 has been diverting water from the Arkansas River and its tributaries in Colorado for the irrigation of lands located entirely in Kansas, was the subject of considerable discussion during the various meetings of the Compact commissioners. These meetings generated several proposals with respect to jurisdiction and control over the Frontier Canal. As a result of continued negotiations among the various commissioners, the

Commission finally adopted Article VI, which provides as follows:

A. (1) Nothing in this compact shall be construed as impairing the jurisdiction of Kansas over the waters of the Arkansas river that originate in Kansas and over the waters that flow from Colorado across the state line into Kansas.

(2) Except as otherwise provided, nothing in this compact shall be construed as supplanting the administration by Colorado of the rights of appropriators of waters of the Arkansas river in said state as decreed to said appropriators by the courts of Colorado, nor as interfering with the distribution among said appropriators by Colorado, nor as curtailing the diversion and use for irrigation and other beneficial purposes in Colorado of the waters of the Arkansas river.

B. Inasmuch as the Frontier canal diverts waters of the Arkansas river in Colorado west of the state line for irrigation uses in Kansas only, Colorado concedes to Kansas and Kansas hereby assumes *exclusive administrative control* over the operation of the Frontier canal and its headworks for such purposes, to the same extent as though said works were located entirely within the state of Kansas. Water carried across the state line in Frontier canal or any other similarly situated canal shall be considered to be part of the state line flow.[1]

§ 37–69–101, Art. VI, 15 C.R.S. (1973) (emphasis added).

The instant case was commenced on February 28, 1985, when the Frontier Ditch Company (Frontier), a mutual ditch company organized to operate the Frontier Canal, filed an application for a determination of a right to divert water through the Frontier Canal's Colorado headgates at the rate of 55 cubic feet per second from Cheyenne Creek and Holly Drain, tributaries of the Arkansas River, for the purpose of irrigating lands located entirely in Kansas. The water right sought by Frontier was the subject of orders issued by the Kansas Chief Engineer in 1950 and 1959, determining that Frontier had a vested right to 5,000 acre feet of water per year from the Arkansas River and its tributaries to be diverted through its Colorado headgates at a maximum rate of 55 cubic feet per second. *See Frontier Ditch Co. v. Chief Engineer*, 237 Kan. 857, 704 P.2d 12 (1985). Frontier sought a Colorado decree for the alleged purpose of protecting its appropriation from junior Colorado appropriators. Frontier's application in the instant case conformed to the quantitative restrictions of the Kansas orders.

Frontier's application was referred to a water referee, and timely statements of opposition were filed by the Southeastern Colorado Water Conservancy District, the Amity Mutual Irrigation Company, the Arkansas Valley Ditch Association, the Catlin Canal Company, and the State and Division Engineers. After the application was referred by the referee to the water judge, the Amity Mutual Irrigation Company, the Arkansas Valley Ditch Association, the Catlin Canal Company, and the Southeastern Colorado Water Conservancy District filed a motion for summary judgment or for a judgment of dismissal on the basis that Article VI B, which states that "Colorado concedes to Kansas and Kansas hereby assumes exclusive administrative control over the operation of the Frontier Canal and its headworks," deprived the water court of jurisdiction over Frontier's application.

The water court dismissed Frontier's application, ruling as follows:

The Compact, in [Article] VI B, provides that Colorado concedes and Kansas assumes exclusive administrative control. In the context of the Kansas law in effect at that time, it must have been contemplated that that was both the jurisdiction to determine and the jurisdiction to administer water rights, because both

---

1. The Compact defines the term "stateline flow" as follows:

The term "stateline flow" means the flow of waters of the Arkansas river as determined by gauging stations located at or near the state-line. The flow as determined by such stations, whether located in Colorado or Kansas, shall be deemed to be the actual stateline flow.

§ 37–69–101, Art. III C, 15 C.R.S. (1973).

functions resided in the Chief Engineer of the State of Kansas. There are separate and distinct functions between the Court and the State Engineer or Division Engineers in Colorado. That's a distinction that does not pertain in Kansas, but given the background of the Kansas law in effect at the time the Compact was adopted by Colorado and then subsequently approved by Congress, that is persuasive in favor of the interpretation that "administrative control" includes the authority and jurisdiction to "determine" water rights.

It's also persuasive that the Compact provides that the water carried across the state line in Frontier shall be considered to be part of the state line flow, and that the control of the headworks should carry with it also the jurisdiction to determine rights at [the] headworks. It's also worth considering that Frontier had a forum in Kansas, Kansas has acted, and has determined the vested rights of Frontier, and further, Frontier has a forum before the Compact administration.

Frontier's motion for reconsideration was denied, and this appeal followed.

Proceeding from the premise that the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, 15 C.R.S. (1973 & 1987 Supp.), grants jurisdiction to a Colorado water court to adjudicate an applicant's right to divert water in Colorado for use on lands located in another state, Frontier argues that although Article VI B of the Compact cedes administrative control over the Frontier Canal to Kansas, the Compact does not deprive a Colorado water court of jurisdiction over Frontier's application. We need not resolve here whether, as asserted by Frontier, the Water Right Determination and Administration Act of 1969 grants jurisdiction to a Colorado water court over an application to make an in-state diversion of water for use on lands located in another state, however, because we are satisfied that Article VI B of the Compact was intended to vest in Kansas both the exclusive jurisdiction over Frontier's application for a determination of a water right and the necessary authority to administer any decreed right in accordance with the Kansas system of water administration.[2]

**2.** In asserting that the Water Right Determination and Administration Act of 1969 confers jurisdiction on a Colorado water court over Frontier's application, Frontier relies on *West End Irrigation Co. v. Garvey*, 117 Colo. 109, 184 P.2d 476 (1947), for the proposition that the situs of a water right for jurisdictional purposes is the point of diversion. Since the points of diversion in Frontier's application are located within the state of Colorado, Frontier argues that the water court has jurisdiction over its application.

Because we resolve this case by construing Article VI B of the Compact as an exclusive jurisdictional grant to Kansas over applications such as Frontier's, it is unnecessary for us to determine whether the Water Right Determination and Administration Act of 1969 confers on a Colorado water court jurisdiction over an application for a determination of a water right involving the diversion of water in the state of Colorado for use on lands in another state. We note in passing, however, that Frontier's reliance on *Garvey* as authority for a per se jurisdictional rule based on the point of diversion is misplaced. In *Garvey*, this court reversed the trial court's ruling that recognized a Colorado decree as conclusively establishing a right to divert water in Utah for use on lands in Colorado. In reversing the judgment, the court remarked that under the water adjudication stat-

ute then in effect a Colorado court had jurisdiction only over questions concerning the priority of appropriation between ditches "drawing water from the same stream or its tributaries within the same water district." *Id.* at 113, 184 P.2d at 478. Since the statutory scheme in *Garvey* did not provide jurisdiction over ditches drawing water in another state, the *Garvey* court held that the trial court lacked jurisdiction to adjudicate the priority of a ditch whose point of diversion was outside of Colorado and, hence, outside of the water district. *Garvey* thus stands for the proposition that the trial court, pursuant to the statutory scheme then in effect, had jurisdiction only over ditches making in-state diversions for in-state uses.

Frontier also claims that *Garvey* impliedly overrules *Lamson v. Vailes*, 27 Colo. 201, 61 P. 231 (1900), which expressly rejected the point of diversion as the sole factor in determining jurisdiction for the adjudication of water right priorities. The *Lamson* court, relying on the same statutory language involved in *Garvey*, held that the trial court lacked jurisdiction to award a priority to a ditch making an in-state diversion of water for use on lands located in New Mexico. In so holding, the court reasoned that it could not "presume that the General Assembly intended to enact a law to operate beyond the territorial limits of the state." 27 Colo. at 203–

## II.

■ The jurisdictional issue in this case turns on the meaning of the term "exclusive administrative control" in Article VI B of the Compact. Since that term is not self-defining, we must look beyond the term itself in order to ascertain the meaning attributed to that term by the Compact Commission. *See, e.g., Mount Washington Tanker Co. v. United States,* 505 F.Supp. 209, 215, 1 C.I.T. 32 (Ct.Int'l Trade 1980), (*aff'd*, 665 F.2d 340, 69 C.C.P.A. 23 (Cust. & Pat.App. 1981); *People v. Miranda,* 754 P.2d 377, 380 (Colo.1988). Several factors lead us to conclude that the term "exclusive administrative control" was intended to vest in Kansas the exclusive jurisdiction to determine any water rights based on the Frontier Canal's diversion of water in the state of Colorado from the Arkansas River and its tributaries for irrigation uses on lands located entirely in the state of Kansas.

### A.

In order to discern the appropriate scope of the term "exclusive administrative control," we initially look to the context in which that term appears. N. Singer, 2A *Sutherland Statutory Construction* § 47.01 (Sands 4th ed. 1984). Article VI B of the Compact states in pertinent part that inasmuch as the Frontier Canal diverts water from the Arkansas River and its tributaries west of the stateline for irrigation uses in Kansas only, "Colorado concedes to Kansas and Kansas hereby assumes exclusive administrative control over the operation of the Frontier canal and its headworks for such purposes, to the same extent as though said works were located entirely within the state of Kansas." This language expresses a clear intent to treat the Frontier Canal and its headworks as if they were geographically situated within the state of Kansas, and strongly suggests

that Colorado has repudiated any jurisdictional claim it might otherwise have to determine applications for water rights based on in-state diversions by the Frontier Canal for the purpose of irrigating lands located entirely in Kansas. Article VI A(1), which states that "[n]othing in this compact shall be construed as impairing the jurisdiction of Kansas over the waters of the Arkansas River ... that flow from Colorado across the state line into Kansas," reinforces the proposition that the term "exclusive administrative control" in Article VI B was intended to vest exclusive jurisdiction in Kansas with respect to diversions made by the Frontier Canal in Colorado from the Arkansas River and its tributaries for irrigation uses on lands located entirely in Kansas.

### B.

We also look to the record of the Compact negotiations for the meaning of "exclusive administrative control." The official record of the commission meetings is part of the record in this case. At the Commission's twelfth meeting, which was held in February 1948, Commissioner George Knapp of Kansas stated that Article VI of the Compact should accomplish two things: first, diversions made by the Frontier Canal from the Arkansas River and its tributaries should be considered Kansas water just as if the same diversions had been made within the state of Kansas; and second, Kansas should have jurisdiction over the Frontier Canal the same as if the canal and its headwaters were located entirely within the state of Kansas. Record, Colorado–Kansas Arkansas River Compact Commission, 12–8 to 9 (Twelfth Meeting, Feb. 3, 4, 5, and 6, 1948). Commissioner Knapp then proposed the following version of Article VI B for the Commission's consideration:

Colorado concedes to Kansas *sole jurisdiction* over the Frontier Canal which diverts water from the Arkansas River

04, 61 P. at 232. In our view, *Lamson* is also reconcilable with the *Garvey* proposition that the trial court, pursuant to the statutory scheme then in effect, had jurisdiction only over ditches that made in-state diversions for in-state uses.

Our resolution of this case on the basis of the Compact permits us to defer for another day the

question whether, in the absence of an interstate compact, the Water Right Determination and Administration Act of 1969 permits a Colorado water court to adjudicate an application for a water right based on the diversion of water in Colorado for use on land in another state.

Basin above the Stateline to the same extent as though said canal and its headwaters were wholly within the State of Kansas, and water diverted across the Stateline in such canal shall be considered water crossing the Stateline.

*Id.* (emphasis added).

At the next meeting of the Commission, which was held in June and July 1948, Commissioner Knapp offered for consideration a proposed Compact which included the following version of Article VI B:

Inasmuch as the Frontier Canal diverts water west of the Stateline at a point in Colorado for irrigation uses in Kansas only, Colorado concedes to Kansas exclusive administrative control over the operation of the Frontier Canal and its headworks for such purposes, to the same extent as though said works were located entirely within the State of Kansas. Water carried across the Stateline through any such canals shall be considered to be part of the Kansas share of water at the Stateline as apportioned under this Compact.

Record, Colorado–Kansas Arkansas River Compact Commission, 13–17 to 25 (Thirteenth Meeting, June 30, July 1, 2, and 3, 1948). Although there was no discussion as to the reason for changing the phrase "sole jurisdiction" in the first proposed version to "exclusive administrative control" in the second proposed version, Commissioner Henry Vidal of Colorado at the fourteenth meeting of the Commission in July 1948 suggested that because Colorado had conceded exclusive jurisdiction over the Frontier Canal to Kansas in the second proposed version of Article VI B, there

should be added to the Article a provision stating that Kansas assumed such jurisdiction. Record, Colorado–Kansas Arkansas River Compact Commission, 14–90 to 91 (Fourteenth Meeting, July 29, 30, and 31, 1948). The Commission agreed to this addition and revised the second proposed version to add the present language which states that "Colorado concedes to Kansas and Kansas hereby assumes exclusive administrative control over the operation of the Frontier canal and its headworks." *Id.*[3] Thus, there is simply no suggestion in the history of the Compact negotiations that the commissioners intended to separate the jurisdictional aspects of water rights involving Frontier Canal diversions in Colorado for irrigation uses solely in Kansas from the administrative aspects of those rights.

### C.

The third factor of significance in construing the term "exclusive administrative control" is the Kansas statutory scheme for the adjudication and administration of water rights which was in effect when Article VI B was formulated and approved by the Compact Commission.[4] In contrast to Colorado's statutory scheme in effect in 1945, which divided the adjudicative and administrative aspects relating to water rights between the judicial system and the state engineer's office, *see* 3B 1935 Colo. Stat.Ann., ch. 90, § 189(2) (jurisdiction of district court over water right claims); 3B, 1935 Colo.Stat.Ann., ch. 90 § 203 (general duties of state engineer), the Kansas Water Appropriation Act, ch. 390, secs. 1–25, 1945 Kan.Sess. Laws 665 (currently codified at Kan.Stat.Ann. §§ 82a–701 to –731 (1984)),

---

**3.** During further discussions at the fourteenth meeting, Commissioner Vidal of Colorado expressed his belief on three occasions that Kansas had exclusive jurisdiction over the Frontier Canal.

**4.** Kansas originally adhered to the common law doctrine of riparian rights for surface water, *see Clark v. Allaman,* 71 Kan. 206, 80 P. 571 (1905), but the Kansas Water Appropriation Act established a statutory system for determining and administering water rights based on the doctrine of prior appropriation. Kan.Stat.Ann. §§ 82a–701 to –731 (1984). Under the Kansas Act, a person seeking to establish a right for the beneficial use of water must file a claim with

the Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture, who is then required to investigate and hold a hearing on the claim and to issue an order determining the existence or nonexistence of the claimed right. *Id.* § 82a–704a(b). The Kansas Act also charges the Chief Engineer with the duty to "enforce and administer the laws of [Kansas] pertaining to the beneficial use of water and [to] control, conserve, regulate, allot and aid in the distribution of the water resources of the state for the benefits and beneficial uses of all of its inhabitants in accordance with the rights of priority of appropriation." *Id.* § 82a–706.

vested the Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture with authority not only to administer the waters of the state, Kan.Stat.Ann. § 82a–706 (1984), but also to issue orders determining the existence of vested water rights,[5] *id.* § 82a–704a(b).

In Kansas, therefore, both today and at the time the Compact was negotiated and formulated, the responsibility for determining the existence of water rights and for administering those rights in accordance with the appropriation doctrine is reposed in a single state officer, the Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture. When viewed against the backdrop of Kansas' statutory scheme and the commissioners' unequivocal decision to treat the Frontier Canal and its headworks as if they were located entirely within the state of Kansas, it is only logical to conclude that the commissioners intended to vest Kansas with both adjudicative and administrative responsibility, consistent with Kansas' statutory scheme of water adjudication and administration, for Frontier Canal diversions in Colorado from the Arkansas River and its tributaries for irrigation uses on lands located entirely in Kansas.

We thus hold that, pursuant to Article VI B of the Compact, Kansas is vested with exclusive jurisdiction to determine Frontier's application for a determination of a right to divert water in Colorado from tributaries of the Arkansas River for irrigation uses on lands located entirely in Kansas and also with the necessary authority to administer any water rights so decreed to the Frontier Canal.

### III.

Frontier has raised three arguments in support of a contrary construction of Article VI B of the Compact. Although we find these arguments unavailing, we briefly address them at this time.

### A.

■ Frontier argues that a construction of Article VI B of the Compact that curtails the jurisdiction of a Colorado water court to protect the right of appropriation would run afoul of Article XVI, section 6 of the Colorado Constitution, which guarantees "[t]he right to divert the unappropriated waters of any natural stream to beneficial uses." While this court over one hundred years ago recognized that the state has a duty, independent of any statutory directive, to protect the right of appropriation, *Coffin v. Left Hand Ditch Co.,* 6 Colo. 443, 446 (1882), recognition of such a duty does not mean that the state is powerless to enter into an interstate compact and thereby delegate this duty to a sister state. *See generally Nebraska v. Iowa,* 406 U.S. 117, 92 S.Ct. 1379, 31 L.Ed.2d 733 (1972). Indeed, it has long been accepted that the equitable apportionment of interstate waters may be accomplished through the use of an interstate compact. *See Kansas v. Colorado,* 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907). Even though existing statutory schemes might well result in a different apportionment of waters, the provisions of such a compact bind the states and their citizens. *Hinderlider v. La Plata River and Cherry Creek Ditch Co.,* 304 U.S. 92, 106, 58 S.Ct. 803, 809, 82 L.Ed. 1202 (1938). Clearly, if a state may equitably apportion interstate waters through the use of an interstate compact, a state may also agree that the sister state to which the water is equitably apportioned will have exclusive authority over the determination of an applicant's right to divert the water and the administration of any such decreed water right.

■ Moreover, the Compact here is not only part of our state statutory law, but is also part of federal law, having been approved by an act of Congress on May 31, 1949, 63 Stat. 145 (1949), and is thus preemptive of any conflicting state law on the same subject. *See Texas v. New Mexico,* 462 U.S. 554, 564, 103 S.Ct. 2558, 2565, 77 L.Ed.2d 1 (1983) (state entering into interstate compact effectively surrenders portion of its sovereignty; and compact, which is superior to prior and subsequent state legislation, governs relations of parties with respect to subject matter of

---

**5.** The Chief Engineer's order determining the existence of a vested water right is final unless appealed to the district court. Kan.Stat.Ann. § 82a–704a(d) (1984).

agreement); *cf. Alamosa–La Jara Water Users Protection Ass'n v. Gould,* 674 P.2d 914, 922–23 (Colo.1984) (state constitutional and statutory laws apply only to water which has not been committed to other states by interstate compact or United States Supreme Court decree). Thus, to the extent that there might be some arguable conflict between Article VI B's grant of exclusive jurisdiction to Kansas and the Colorado water court's jurisdiction, Article VI B is the supreme law of the land and governs the rights of the parties in this case.

### B.

■ Frontier also claims that, although the water rights at issue in this case are the subject of 1950 and 1959 orders of the Kansas Chief Engineer entered in accordance with Kansas law and Article VI B of the Compact, a Colorado adjudication of its application for a determination of a water right is essential to protect itself from any junior appropriators subsequently obtaining a Colorado decree to divert water from Cheyenne Creek and Holly Drain, both of which are in former Water District 67 and allegedly have an insufficient flow of water to satisfy further appropriations. We are satisfied, however, that Article V H of the Compact provides adequate protection to Frontier.

Article V H states in pertinent part as follows:

> If the usable quantity and availability for use of the waters of the Arkansas river [which by definition include tributaries of the Arkansas river, § 37–69–101, Art. III B, 15 C.R.S. (1973)] to water users in Colorado water district 67 and Kansas will be thereby materially depleted or adversely affected, ... the ditch diversion rights from the Arkansas river in Colorado water district 67 ... shall not hereafter be increased beyond the total present rights of said ditches, without the [Arkansas River Compact] administration ... making findings of fact that no such depletion or adverse effect will result from such proposed ... increase.

§ 37–69–101, Art. V H, 15 C.R.S. (1973). Article V H of the Compact clearly protects Frontier's diversions from depletion by subsequent appropriators seeking to divert from Cheyenne Creek and Holly Drain as well as the Arkansas River, because the applications of subsequent appropriators for diversions would be required to comply with Article V H and these applications would be reviewed by both the Arkansas River Compact Administration and the Colorado water court for compliance with Article V H.

### C.

Frontier last argues that unless a Colorado water court has jurisdiction to determine its application, it will be deprived of a forum in violation of due process of law and equal protection of the laws under the United States Constitution. Frontier's argument is factually unsupported and hence legally unsound. Not only has the Compact provided Frontier a Kansas forum to adjudicate its water rights, but Frontier has also availed itself of the Kansas forum in obtaining orders confirming its right to divert 5,000 acre feet of water per year from the Arkansas River and its tributaries at the rate of 55 cubic feet per second.

The judgment of the water court is affirmed.