**MOUNT WASHINGTON TANKER COMPANY, a Subsidiary of Victory Carriers, Inc., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**Court No. 73–6–01399.**

United States Court of International Trade.

Dec. 5, 1980.

Rode & Qualey, New York City (John S. Rode and David C. Williams, New York City, on briefs), for plaintiff.

Alice Daniel, Asst. Atty. Gen., Washington, D. C., Joseph I. Liebman, Atty. in Charge, Field Office for Customs Litigation, New York City (Susan C. Cassell, New York City, on the brief), for defendant.

RE, Chief Judge:

In this action, plaintiff seeks summary judgment of its claim alleging that the Customs Service incorrectly denied it remission of certain duties assessed on repairs to a vessel. Asserting that the assessment of duties was proper, defendant has cross-moved for summary judgment.

The repairs were performed on plaintiff's tanker, the T/S *Mount Washington*, a vessel documented under the laws of the United States. At the time of the repairs, the vessel was engaged in transporting oil between various Pacific ports. The repairs, which consisted of overhauling the main generator, were not occasioned by stress of weather or other casualty at sea, and, therefore, would not qualify for the remission of duties under 19 U.S.C. § 1466(b). *See Suwannee Steamship Co. v. United States*, 79 Cust.Ct. 19, C.D. 4708, 435 F.Supp. 389 (1977).

In the making of the repairs, plaintiff did not use regular members of the ship's crew. Instead, plaintiff hired employees of a Swedish corporation who were flown from Sweden to the Philippines to join the tanker. These repairmen, signed on as special members of the crew, were on the T/S *Mount Washington* for about a month and a half.

During most of this time, the ship was on the high seas. For brief periods, however, the ship put into the ports of Subic Bay, Singapore and Bahrein. Although the T/S *Mount Washington* was not brought into a shipyard on these occasions, the Swedish employees performed repairs while the ship was at those ports. Upon completion of their work, the Swedish employees disembarked at the port of Manila and were flown back to Sweden.

Upon the tanker's return to the United States port of Honolulu, the Customs Service assessed duties on the expenses of the repairs pursuant to 19 U.S.C. § 1466(a). Under that section, a duty of 50 percent is assessed on "the expense of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade." In computing the duties, Customs included not only the cost of the repairs performed in port, but also the cost of the work performed at sea. Customs also included the compensation paid to the repairmen for the time spent traveling between Sweden and the T/S *Mount Washington.*

Plaintiff, whose petition for remission of the repair duties was denied, has brought this action to recover the duties paid alleging that none of the repairs fall within the meaning of 19 U.S.C. § 1466(a). Additionally, as a first alternative claim, plaintiff urges that any duties assessed should be limited to the cost of repairs actually performed while the ship was at port. As a second alternative claim, plaintiff maintains that, even if both the repairs performed at sea as well as those in port are to be included in computing the dutiable expenses, the travel compensation of the repairmen, i. e., the $1.60 per hour paid the workers during their journeys, should not be included.

The facts are not in dispute. What is in issue is the interpretation and application of section 1466(a),[1] which reads, in pertinent part:

"§ 1466. Equipment and repairs of vessels

(a) Vessels subject to duty; penalties

The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the *expenses of repairs made in a foreign country* upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country...." (Emphasis added.)

Section 1466(b) provides for the remission of duties for certain necessary repairs. It states that:

"If the owner or master of such vessel furnishes good and sufficient evidence that—

(1) such vessel, while in the regular course of her voyage, *was compelled, by stress of weather or other casualty, to put into such foreign port* and purchase such equipments, or make such repairs, to secure the safety and seaworthiness of the vessel to enable her to reach her port of destination;

(2) such equipments or parts thereof or repair parts or materials, were manufactured or produced in the United States, and the *labor* necessary to install such equipments or to make such repairs *was performed by residents of the United States, or by members of the regular crew of such vessel*; or

(3) such equipments, or parts thereof, or materials, or labor, were used as dunnage for cargo, or for the packing or shoring thereof, or in the erection of temporary bulkheads or other similar devices for the control of bulk cargo, or in the preparation (without permanent repair or alteration) of tanks for the carriage of liquid cargo;

then *the Secretary of the Treasury is authorized to remit or refund such duties,* and such vessel shall not be liable to forfeiture...." (Emphasis added.)

Although the claim appears to be cast in terms of a remission of duties, it is clear that the claim is not based on section 1466(b), but, rather, upon the contention that the repairs were not subject to the foreign repair duties imposed by section 1466(a). It may nevertheless be noted that the exercise of the authority by the Secretary of the Treasury to remit foreign repair duties is subject to judicial review. Judicial review of discretionary administrative ac-

---

1. Pub.L.No.91–654, 84 Stat. 1944, recodified 19 U.S.C. §§ 257, 258 as 19 U.S.C. § 1466.

tion is available to assure that the action is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Judicial decisions teach that in cases of express delegation of discretionary authority, the courts have held the scope or standard of judicial review to be limited. If the administrative decision has a rational basis in fact and is not contrary to law, the courts will not substitute their discretion for that of the administrator. See cases cited in *Suwannee Steamship Co. v. United States*, 79 Cust.Ct. 19, 24, C.D. 4708, 435 F.Supp. 389 (1977).

■ Plaintiff's claim for remission or refund of duties on the cost of repairs performed while the T/S *Mount Washington* was in port at Subic Bay, Singapore and Bahrein is without merit. It has not claimed that those repairs were necessitated "by stress of weather or other casualty." Since they were clearly "made in a foreign country," the repair duties were lawfully imposed, and the Secretary's refusal to remit or refund those duties was entirely proper.

The question presented by plaintiff's alternative claim is whether the repairs made on the high seas were dutiable within the meaning of section 1466(a) which provides for the imposition of duties on the "expenses of repairs made in a foreign country." The court must also determine whether the amount paid the Swedish employees for travel to and from Sweden and the Philippines to perform the repairs was properly included as an expense of the repairs.

It is plaintiff's contention that the requirement in section 1466(a) that repairs be performed in a foreign country "necessarily limits the applicable area to the sovereign territory of a particular state and does not extend to every area outside of the United States." Thus, it maintains that "repairs performed outside a sovereign territory are not performed in a foreign country," and, therefore, are not dutiable. Since the repairs, except for those made at the ports of Subic Bay, Singapore and Bahrein, were made on the high seas, outside the sover-

eign territory of any state, plaintiff concludes that they were not performed "in a foreign country."

Plaintiff further contends that, since the meaning of the term "foreign country" is plain on its face, it is improper to consult legislative history to determine its meaning. Were legislative history to be consulted, however, plaintiff suggests that the legislative purpose of the statute is to protect American shipyards. It asserts that the statutory protection for American shipyards should not be extended to include on board repairs.

■ On the facts presented, it is the determination of the court that the ordinary repairs made on the high seas by employees of a Swedish corporation, flown from Sweden and signed on as special members of the crew for the special purpose of making repairs, are dutiable within the meaning of section 1466(a).

■ It has been stated that "[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' " *United States v. American Trucking Associations*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940). It cannot be questioned that the courts must in all cases interpret a statute to give effect to the statutory purpose and legislative intent. *Sandoz Chemical Works, Inc. v. United States*, 43 CCPA 152, C.A.D. 623 (1956); *Schmidt, Pritchard & Co., Inc., et al. v. United States*, 77 Cust.Ct. 1, C.D. 4666 (1976). Hence, it has been held that when "it appears that a literal interpretation of the statute involved would produce a result contrary to the apparent legislative intent, then the letter of the statute must yield and the legislative intent be carried out. [Cases cited.]" *Procter & Gamble Manufacturing Co. v. United States*, 19 CCPA 415, T.D. 45578, *cert. denied*, 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546 (1932). *See also S & T Imports, Inc. v. United States*, 78 Cust.Ct. 45, C.D. 4690 (1977).

Plaintiff contends that the term "foreign country" is unambiguous, and that its common meaning "precludes any finding that the high seas are a 'foreign country' for purposes of 19 U.S.C. § 1466(a)." In support, the plaintiff cites cases in which the words "country" and "foreign country" have been given a meaning which connotes sovereignty and control over a particular place or area. *See The Winnie*, 65 F.2d 706 (3d Cir. 1933). Plaintiff submits that repairs performed outside a sovereign territory are not performed in a foreign country, and, therefore, are not dutiable. In support of its contention plaintiff cites the long established principle of international law that the sea is "the common property of all nations." *See The Adventure*, 1 Fed.Cas. 202 (C.C.D.Va.1812) (No. 93), *rev'd on other grounds*, 12 U.S. (8 Cranch) 221, 3 L.Ed. 542 (1814).

Defendant, on the other hand, contends that, notwithstanding a common meaning that would appear to exclude the "high seas," the words "foreign country" have not been treated uniformly by all courts. It stresses that "foreign country" has been given a different meaning depending upon the legislative purpose, and, therefore, has acquired no precise or inflexible definition. As an example, the defendant has cited an early Supreme Court case which considered the "high seas" to be a foreign country. In that case, *The Brig Concord*, 13 U.S. (9 Cranch) 387, 3 L.Ed. 768 (1815), the Supreme Court held that goods, captured on the high seas by an American privateer from a neutral Spanish ship, were dutiable under the tariff laws when brought into the United States to be commingled and sold in the commerce of this country.

In *Procter & Gamble Manufacturing Co. v. United States, supra*, also cited by the defendant, whale oil was produced aboard a Norwegian ship and brought into this country. The question presented was whether the whale oil was dutiable under the statutory provision for the imposition of duties "upon all articles when imported from any foreign country into the United States." In affirming this court's holding that it was dutiable, the Court of Customs and Patent Appeals, citing the Supreme Court case of *Burnet v. Chicago Portrait Co.*, 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587 (1932), stated:

"There is no hard and fast definition for the term 'foreign country,' as it appears in the acts before us. Such meaning may be broad or narrow, as the apparent intent of the statute requires." 19 CCPA at 421.

Despite the fact that the whale oil was produced outside the territorial sovereignty of a foreign country, specifically, on the high seas, the tariff laws of the United States, which spoke of articles "imported from any foreign country," were interpreted to include importations from the high seas.

Both the *Brig Concord* and the *Procter & Gamble* cases demonstrate clearly that the courts are mindful of the legislative purpose sought to be accomplished by the tariff laws of the United States. Indeed, the Court of Customs and Patent Appeals in *Procter & Gamble* noted that:

"If this language [foreign country] were to be literally construed, therefore, goods that come from the high seas might seem not to be imported from a foreign country, for the high seas are the common property of all nations and the exclusive property of none." 19 CCPA at 418.

Similarly, in the *Brig Concord* case, the Supreme Court distinguished between "goods . . . brought by superior force, or by inevitable necessity, into the United States," and those which may be "afterwards sold or consumed in the country." The Supreme Court stated that goods brought by superior force or inevitable necessity are "not deemed to be so imported." It noted, however, that if such goods "are afterwards sold or consumed in the country, . . . they become retro-actively liable to the payment of duties." (9 Cranch) 13 U.S. at 388, 3 L.Ed. 768.

The protection of the American manufacturer of goods in the *Brig Concord* case, and the American fisheries industry in the *Procter & Gamble* case, was clearly in the mind

of the courts in interpreting the applicable statutory language. Thus, it is clear that in interpreting the meaning of statutory terms used in tariff laws the courts have not been inflexible, but have striven to effectuate the animating purpose of the legislation.

■ There is no doubt as to the legislative purpose which underlies section 1466. As indicated in *Suwannee Steamship Co. v. United States*, 79 Cust.Ct. 19, 26, C.D. 4708, 435 F.Supp. 389 (1977), section 1466 expresses the legislative policy designed to provide maximum protection to American shipyards. *See also Erie Navigation Co. v. United States*, 83 Cust.Ct. 47, C.D. 4820, 475 F.Supp. 160 (1979); *United States v. Gissel*, 353 F.Supp. 768, 772 (S.D.Tex.1973), *aff'd*, 493 F.2d 27 (5th Cir. 1974).

In *Suwannee* the court also reviewed the unsuccessful attempts during the consideration of the Tariff Act of 1930 to increase the situations in which duties could be remitted under proposed revisions. In rejecting those proposals, the court noted the concern of Congress that they "would have provided *insufficient* protection to American shipyards, the class for whose benefit the section was originally formulated." (Emphasis added.) 79 Cust.Ct. at 26, 435 F.Supp. 389.

The court's conclusion in *Suwannee*, that Congress intended to formulate "a narrow and strict remission provision" in order to protect American shipyards, is strongly documented by the legislative history of section 1466. Plaintiff, however, in its response to defendant's cross-motion for summary judgment, disagrees, and states that "the purposes and language [of the remission provision section 1466(b)] are subordinate to the general provisions of 19 U.S.C. 1466(a)."

No subdivision should be interpreted in isolation, and, in order to ascertain and effectuate its legislative objective, section 1466 must be read in its entirety. It cannot be questioned that the protection of the domestic shipbuilding and repair industries was of paramount importance in the enactment of this legislation. It also cannot be questioned that, as noted in the *Erie Navigation* case, the concern for these industries was a permissible legislative object.

In its response to defendant's cross-motion for summary judgment, plaintiff contends that, in the repairs performed on the T/S *Mount Washington*, it did not utilize "foreign equipment, materials, shipyards, machine tools, derricks or drydocks; all the domestic counterparts of which were granted protection by Congress."[2] In this statement plaintiff omits any reference to "labor" despite the fact that the use of *labor* is the heart of the controversy.

That labor was also included in the protection afforded the domestic shipbuilding and repair industries is fully supported by the legislative history of section 1466 and its predecessor provisions. During Congressional hearings on H.R. 2667, which became the Tariff Act of 1930, the report of the House Ways and Means Committee stated:

"The *labor cost* in production *is an essential factor.* The average rate of wages abroad is 40 percent or less than that in the United States. While the effectiveness of foreign labor is increasing, their wage scales have not increased in proportion. This creates a serious situation not only for the manufacturer *but for the laborer.*" H.R.Rep.No.7, 71st Cong., 1st Sess. 4 (1929). (Emphasis added.)

*See also Hearings Before the Committee on Ways and Means of the House of Representatives, Tariff Readjustment—1929*, 70th Cong., 2d Sess. (1929), Vol. XVI, p. 10290. It should also be noted that one of the expressly stated purposes of H.R. 2667 was "to protect American labor."

■ From this Congressional concern for American labor, it cannot be questioned that the protection afforded under section 1466 to domestic shipbuilding and repair

---

**2.** Counsel's statement is correct with the exception of an amount of $63.86 for "cost of material" as indicated in invoice No. 3139.

industries was also intended to include labor and labor costs. It is also noteworthy that, in 1930, the phrase, "performed by residents of the United States, or by members of the regular crew" was added to what is now numbered section 1466(b), leaving no doubt that *labor*, as well as the physical facilities of the shipyard, was intended to be protected.

In considering whether the repairs performed on the T/S *Mount Washington* by a specially hired foreign crew are dutiable under section 1466(a), the court is not unmindful of the possibility that on board repairs might be performed also by United States shipbuilding or repair industries. That question, however, is not before the court. The question presented is limited to whether the on board ordinary repairs performed in the present case, by a foreign crew on the high seas, are embraced within the term "foreign country" within the intendment of section 1466(a).

From all of the foregoing, the court has concluded that, in this case, were the statutory language "foreign country" to exclude the high seas from its ambit, the legislative purpose of section 1466 would be frustrated. It is apparent from a reading of all the cases cited, which plaintiff observes are "not dispositive in interpreting 19 U.S.C. 1466," that the courts, in all instances, have furthered, not frustrated the legislative purpose of the statutes under examination. The cases reveal that the interpretation of the words "foreign country" is based upon the courts' understanding of the purpose and intent which underlie the governing statute. In the words of Mr. Justice Reed in *United States v. Spelar*, 338 U.S. 217, 221, 70 S.Ct. 10, 12, 94 L.Ed. 3 (1949), "the legislative will must be respected." Thus, to fulfill the legislative intent the term "foreign country" has been interpreted to mean a place foreign to or outside the territorial limits of the United States. *See Procter & Gamble Manufacturing Co. v. United States*, 19 CCPA 415, T.D. 45578,

*cert. denied*, 287 U.S. 629, 53 S.Ct. 82, 77 L.Ed. 546 (1932).

That the term "foreign country" has no definitive meaning, apart from its statutory setting, may also be gleaned from the concurring opinion of Mr. Justice Frankfurter in *Spelar*, in which he stated that:

"To assume that terms like 'foreign country' and 'possessions' are self-defining, not at all involving a choice of judicial judgment, is mechanical jurisprudence at its best. These terms do not have fixed and inclusive meanings, as is true of mathematical and other scientific terms. Both 'possessions' and 'foreign country' have penumbral meanings, which is not true, for instance, of the verbal designations for weights and measures. It is this precision of content which differentiates scientific from most political, legislative and legal language." 338 U.S. at 223, 70 S.Ct. at 13.

■ The question presented is not simply the meaning of "high seas." It is not questioned that these words have acquired a special meaning in public international law which deals with the mutual relations of states.[3] The question presented here, however, is the meaning of the term "foreign country" within the intendment of 19 U.S.C. § 1466(a). To exclude the high seas from the statutory words "foreign country" in the present case, as urged by plaintiff, would frustrate the legislative purpose of aiding American shipyards and American labor. Within the meaning of section 1466(a), the statutory words "foreign country" must include the high seas if its legislative purpose is to be furthered. Notwithstanding any meaning in other contexts, for purposes of section 1466(a) the on board repairs to the T/S *Mount Washington* on the high seas were "repairs made in a foreign country."

The remaining question pertains to the inclusion, in the cost of repairs, of the compensation paid to the foreign repairmen during the travel time to and from the ship.

3. On the concept of "freedom of the seas" and the regime of the high seas in international law, see II O'Connell, *International Law* 704 (1965) and materials in Henkin, Pugh, Schachter and Smit, *International Law Cases and Materials* 380 *et seq.* (1980).

In support of its claim that these expenses should not have been included, plaintiff has cited several cases wherein expenses incident to the repairs, but not directly involved in the repair making itself, have been held to be nondutiable.

Thus, in *International Navigation Co., Inc. v. United States*, 38 Cust.Ct. 5, 12, C.D. 1836, 148 F.Supp. 448 (1957), this court considered a determination by the Customs Service that the expense of a repair shop truck and of a launch, delivering repairmen and materials from the pier to the ship at anchor, was dutiable as part of the repair costs. The court found that the transportation of the men and materials was "not part of the actual repairs nor the cost of labor in connection therewith." Hence, the transportation costs were held to be not dutiable as "expenses of repairs."

In the *International Navigation* case, the court cited *American Mail Line, Ltd. v. United States*, 34 Cust.Ct. 197, C.D. 1704, *aff'd on rehearing*, 35 Cust.Ct. 142, C.D. 1735 (1955), and other cases which passed upon the dutiability of certain labor charges. The court in the *American Mail Line* case stated that "Congress intended that labor charges for the installation of equipment, unless paid to regular crew members, should be dutiable," and distinguished between various labor charges in the following quotation:

"It has been held that shifting boards and feeder boxes are equipment within the meaning of section 466 [19 U.S.C. § 1466], *supra*, and that the cost of materials and labor necessary for their erection is dutiable. [Cases cited.] Dunnage mats have also been held dutiable as equipment [cases cited], but, in our view, the placing of such articles aboard ship is not the *installation* of equipment. The term 'install' means to set up or fix in position for use, such as a lighting system, a hot-water system, a furnace, fixtures for a restaurant, a sidewalk elevator.... Items, such as dunnage mats, which are not fixed in position or attached to the vessel are not 'installed' within the meaning of that term. There-

fore, the items herein for laying and handling dunnage ... are not dutiable under section 466 [19 U.S.C. § 1466], *supra*." 34 Cust.Ct. at 201. (Emphasis in original.)

An additional case cited by the plaintiff is *Geo. Hall Coal Co. v. United States*, 11 Treas.Dec. 318, T.D. 27154 (1906), wherein it was held that expenses of drydocking a vessel undergoing repairs were not dutiable as an expense of repair.

█ It is clear that the travel compensation paid the workers, although an expense incident to the repairs, was not an expense directly involved in the making of the repairs. This item of expense is analogous to transportation costs which are not dutiable as "expenses of repairs" since they are "not considered part of the actual repairs." *International Navigation Co., Inc. v. United States*, 38 Cust.Ct. at 12, 148 F.Supp. 448. Hence, the inclusion of that item in the cost of repairs was erroneous.

Accordingly, plaintiff's motion is denied and defendant's motion is granted with respect to the repairs performed in foreign ports and on the high seas, and plaintiff's motion is granted and defendant's motion is denied with respect to the foreign workers' travel compensation. Judgment will issue accordingly.