**TEXACO MARINE SERVICES, INC. and Texaco Refining and Marketing, Inc., Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 93–1354.

United States Court of Appeals, Federal Circuit.

Dec. 29, 1994.

---

Sharon Steele Doyle and Robert T. Givens, Givens & Kelly, Houston, TX, argued, for plaintiffs-appellants.

Bruce N. Stratvert, Commercial Litigation Branch, Dept. of Justice, New York City, argued, for defendant-appellee. With him on the brief were Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director and Joseph I. Liebman, Atty. In Charge, Intern. Trade Field Office. Of counsel was Stephen Berke, Office of the Asst. Chief Counsel, Intern. Trade Litigation, U.S. Customs Service.

Lauren R. Howard, Collier, Shannon, Rill & Scott, Washington, DC, was on the brief, for amicus curiae, Shipbuilders Council of America, Inc.

Ernest J. Corrado, President and Counsel for the American Institute of Merchant Shipping, Washington, DC, was on the brief, for amicus curiae, The American Institute of Merchant Shipping (AIMS).

Before RICH, MAYER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Texaco Marine Services, Inc. (TMSI) and Texaco Refining and Marketing, Inc. (TRMI) (collectively "Texaco") appeal from the March 10, 1993 judgment of the United States Court of International Trade, *Texaco Marine Servs., Inc. v. United States,* 815 F.Supp. 1484, which denied Texaco's motion for summary judgment, granted the government's cross-motion for summary judgment, and dismissed Texaco's action. In the opinion supporting its judgment, the Court of International Trade determined that certain expenses for cleaning, wrapping heating coils, and blanking cargo lines upon a United States-flagged vessel by a foreign crew were integral to foreign repairs subject to the fifty percent *ad valorem* duty of the vessel repair statute, 19 U.S.C. § 1466 (1988), because the expenses would not have been necessary but for the repairs. *Id.* at 1486. Based upon that determination, the court held that the expenses were "expenses of repairs" within the meaning of the vessel repair statute and therefore subject to the *ad valorem* duty. We affirm.

## BACKGROUND

### I. *The Vessel Repair Statute*

The vessel repair statute, first enacted in 1866, imposes a fifty percent duty on the value of "expenses of repairs" made in a foreign country upon United States-flagged vessels. The statute, in subsection (a), provides in pertinent part:

**(a) Vessels subject to duty; penalties**

The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made. in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in

any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country.

19 U.S.C. § 1466(a) (1988). If expenses incurred in a foreign port are not "expenses of repairs" within the meaning of the statute, the expenses are not subject to the vessel repair duty. That is the case, for example, where the expenses are for routine cleaning of the vessel. *See, e.g., Northern Steamship Co. v. United States*, 54 Cust.Ct. 92, 96–98 (1965) (finding that certain expenses were for routine cleaning and not for repair or restoration of the vessel because of deterioration and damage, and therefore holding that such expenses were not subject to the vessel repair duty).[1]

## II. *Facts of the Case*

The subject vessel, the S.S. TEXACO GEORGIA (the GEORGIA), is an oil tanker registered under the laws of the United States. The GEORGIA is owned by TRMI and managed by TMSI. Commencing on June 16, 1987, and continuing until July 18, 1987, certain services and repairs were performed on the GEORGIA by foreign labor at the Hellenic Shipyards Co. (Hellenic) in Athens, Greece. Following the repairs, the GEORGIA returned to the United States, arriving in Port Arthur, Texas, on August 11, 1987. Upon arrival, TMSI declared and entered with the United States Customs Service (Customs) the expenses that were incurred for services and repairs performed on the GEORGIA in Greece (entry no. C21–0000060–6), as is required under 19 C.F.R. § 4.14(b).[2]

Four of the numerous itemized expenses in the entry are at issue in this appeal. Three of the four expenses were for cleaning performed subsequent to dutiable repairs. The fourth was for work associated with protective coverings used during dutiable repairs. The facts regarding the four expenses at issue—as set forth in uncontested documents, in an affidavit of Neal McPhee in support of Texaco's summary judgment motion, and in Texaco's appeal briefs—are as follows:

1. *Clean-up following boiler room repairs:* The first cleaning task is described in item B–27 of Hellenic's invoice to TMSI. Invoice item B–27 states: "After boiler repairs and other repairs are completed in the boiler room areas, furnish necessary facilities, materials and labour to clean completely all debris and accumulated soot in the upper and lower fire room...." Texaco did not dispute the dutiability of the expenses of repairs in the boiler room area. Neither did it dispute that at least some of the cleaned-up debris (e.g., soot, old brickwork, old insulation, casing sealer, and rust) was generated by the actual making of the repairs. Texaco argued, however, that a portion of the debris referred to in B–27 was not dutiable because it was trash (e.g., soft drink cans and plastic bags) left behind by the workers who performed the repairs in the boiler room area and therefore did not result from repair work itself.

2. *Clean-up following cargo tank repairs:* The second cleaning task is described in item G–2(g) of the invoice as follows: "All tanks cleaned by removal of grits, debris, etc. and left ready for cargo loading[,] also exposed decks and deck machineries cleaned." More

---

**1.** *Northern Steamship* is a decision of the United States Customs Court. In 1980, Congress expanded the jurisdiction and powers of the Customs Court and, to more accurately describe the court's clarified and expanded jurisdiction and its new judicial functions relating to international trade, changed the court's name to the United States Court of International Trade. *Customs Courts Act of 1980*, Pub.L. No. 96–417, 94 Stat. 1727 (1980); H.R.Rep. No. 1235, 96th Cong., 2d Sess. 20 (1980), *reprinted in* 1980 U.S.C.C.A.N. 3729, 3731–32.

**2.** *A vessel owner is required, upon first arrival of the vessel in the United States, to declare to*

Customs all repairs made outside the United States, regardless of the dutiable status of the repairs. 19 C.F.R. § 4.14(b)(1) (1994). The vessel owner also must file an entry of the repairs with Customs. *Id.* § 4.14(b)(2). As part of the entry process, the vessel owner is required to estimate the duties owed and, in most cases, deposit the estimated amount of duties with Customs. *Id.* § 4.14(b)(1). The procedures set forth in the present regulation are the same in substance as the procedures in effect when the entries of this case were made. *See* 19 C.F.R. § 4.14 (1987).

specifically, the item G–2(g) cleaning involved "sweeping and mopping inside the tanks and sweeping, mopping, shoveling, hosing down outside the tanks, and the removal and transport of debris off of the vessel." The item G–2(g) cleaning work followed the grit-blasting and coating of fifteen of the GEORGIA's cargo tanks. The work did not involve the tanks that were grit-blasted and coated, however. Rather, it involved cleaning tanks that were left exposed to air-borne particles from the tanks that were being grit-blasted. After the cargo tanks were cleaned, they were used to transport lubricating oils. Texaco disputes the dutiability of the expenses from cleaning tanks that were not grit-blasted and coated.

3. *Clean-up following "after peak" tank repairs:* The third cleaning task is described in invoice item H–29(f) as follows: "Removed all debris and sediment from After Peak, leaving ready for filling." The "after peak" tank is the extreme rear compartment in a vessel's hold where the ship narrows toward the sternpost. The cleaning of the after peak tank followed repair work on the tank. When the clean-up was finished, the tank was filled with fresh, distilled water. Texaco did not dispute the dutiability of the expenses of the repair work, and did not dispute that at least some of the cleaned-up debris (e.g., rust, scale, slack, air-borne materials) was generated by the repairs. As with the clean-up following repairs in the boiler room area, however, Texaco contended that expenses related to cleaning up debris left behind by the workers who performed the repairs were not dutiable.

4. *Protective coverings used during cargo tank repairs:* The last expense related to protective coverings used in conjunction with the grit-blasting and coating repairs described above. The work relating to the protective coverings is described in item G–2(f) as follows: "Protected heating coils by wrapping in place, total 2661 meters and cargo lines blanked as necessary in way of removals." The heating coils were wrapped to prevent work crews from inadvertently coming in contact with the coils and damaging them. The blanking of the cargo lines involved covering the openings for the lines in the fifteen tanks that were grit-blasted and coated. The lines had to be blanked in order to prevent dirt and air-borne particles from entering them. Texaco contends that it did not request that the work set forth in invoice item G–2(f) be performed, although it is undisputed that Hellenic was paid for performing the work.

Customs concluded that the above-described expenses were dutiable as "expenses of repairs" within the meaning of the vessel repair statute. Thus, when Customs liquidated the GEORGIA's vessel repair entry and assessed duties in the amount of $294,846.38, the assessment included: (1) $17,454.50, as duties and interest on the cleaning expenses described above; and (2) $10,459.50, as duties and interest on the expenses associated with protective coverings described above. After the full amount of assessed duties was paid, Texaco filed a protest, arguing that the cleaning and protective covering expenses were not "expenses of repairs" within the meaning of the vessel repair statute. In due course, Customs denied the protest, whereupon Texaco filed suit in the Court of International Trade.

### III. *Proceedings in the Court of International Trade*

In its motion for summary judgment pursuant to Rule 56(c), Ct.Int'l Trade R., Texaco argued that duties should not have been assessed on the cleaning expenses or on the expenses associated with protective coverings because those expenses were not "expenses of repairs" within the meaning of § 1466(a). In cross-moving for summary judgment, the government countered that the subject expenses were "expenses of repairs" within the meaning of § 1466(a) in that they were "integral to" and "necessary for" the dutiable repairs. In other words, the government argued, the expenses would not have been necessary "but for" the dutiable repairs. The Court of International Trade agreed with the government.

First, with respect to the cleaning expenses, the court determined that "had it not been for the repairs on the Texaco Georgia, the cleaning would not have been necessary." 815 F.Supp. at 1486. Then, it concluded that

where cleaning services are an "integral" or a "necessary" part of dutiable repairs, then the cleaning itself is dutiable as coming within the meaning of the vessel repair statute's "expenses of repairs." 815 F.Supp. at 1486. Accordingly, the court held that the cleaning expenses at issue were dutiable. *Id.* With respect to the expenses associated with protective coverings used during dutiable repairs, the court determined that these expenses, like the cleaning expenses, were integral to the repair process and would not have been necessary but for the repairs. *Id.* From that, the court held that the expenses associated with protective covering work were also dutiable. *Id.* at 1486–87.

## DISCUSSION

### I. *Standard of Review*

■ Summary judgment is proper in the Court of International Trade where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as·a matter of law." Ct. Int'l Trade R. 56(c). This is the same standard as is set forth in Rule 56(c) of the Federal Rules of Civil Procedure. This court reviews a grant of summary judgment by the Court of International Trade "for correctness as a matter of law, deciding *de novo* the proper interpretation of the governing statute and regulations as well as whether genuine issues of material fact exist." *St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763, 767 (Fed.Cir.1993).

### II. *Contentions of the Parties*

Texaco contends that the Court of International Trade erred in treating clean-up expenses and protective covering expenses as "expenses of repairs" within the meaning of § 1466(a). According to Texaco, such treatment is contrary to the vessel repair statute and also inconsistent with prior judicial constructions of "expenses of repairs." Further, Texaco contends that Customs's assessment of the fifty percent *ad valorem* duty on the expenses at issue was improper, in that Customs impermissibly expanded its interpretation of the phrase "expenses of repairs" with-

out the requisite notice being given to the trade through notice in the Federal Register. The government maintains that the Court of International Trade properly interpreted the phrase "expenses of repairs" in holding that the expenses for cleaning and protective covering work were dutiable under the statute. The government also maintains that there was no established and uniform practice that the expenses were non-dutiable, so as to require notice to the public of a change in administrative practice.

For the reasons set forth below, we hold that the imposition of the fifty percent *ad valorem* duty upon the expenses at issue in this case was consistent with the vessel repair statute and not contrary to any established and uniform practice of Customs.

### III. *Analysis*

#### A.

As already noted, the imposition of a fifty percent *ad valorem* duty on foreign expenses of repairs on United States-flagged vessels dates back to the original enactment of the vessel repair statute in 1866. Act of July 18, 1866, ch. 201, § 23, 14 Stat. 178, 183. The "expenses of repairs" phrase has remained unchanged during the statute's 130–year history, and is in the current version of the statute codified at 19 U.S.C. § 1466(a). The statute has never specifically defined the scope of the phrase "expenses of repairs."

Our interpretation of the statute begins with the language employed by Congress. *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1579 (Fed.Cir.1990) (citing *Mallard v. United States Dist. Ct. for S. Dist. of Iowa,* 490 U.S. 296, 300–01, 109 S.Ct. 1814, 1817–18, 104 L.Ed.2d 318 (1989)), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991). The language with which we are concerned provides that the vessel repair duty is to be assessed upon "[t]he equipments, or any part thereof ... purchased for, or the repair parts or materials to be used, or the *expenses of repairs* made in a foreign country upon a vessel documented under the laws of the United States...." 19 U.S.C. § 1466(a) (1988) (emphasis added). This language is qualified

only by the several specific exceptions that appear in subsections (a) and in subsections (d)–(f) of § 1466; Texaco does not allege that any of these exceptions apply in the present case.

■ Texaco urges us to reject the Court of International Trade's "but for" approach and to interpret "expenses of repairs" so as to exclude those expenses (e.g., expenses for clean-up and protective covering work) not incurred for work directly involved in the actual making of repairs. Such a reading has no basis in the plain language of the statute, however. Aside from the inapplicable statutory exceptions, the language "expenses of repairs" is broad and unqualified. As such, we interpret "expenses of repairs" as covering all expenses (not specifically excepted in the statute) which, but for dutiable repair work, would not have been incurred. Conversely, "expenses of repairs" does not cover expenses that would have been incurred even without the occurrence of dutiable repair work. As will be more clearly illustrated below when we address the specific expenses at issue in this case, the "but for" interpretation accords with what is commonly understood to be an expense of a repair. *See E.M. Chems. v. United States,* 920 F.2d 910, 913, 9 Fed.Cir. (T) 33, 37 (1990) ("[T]ariff terms are to be construed in accordance with their common and popular meaning, in the absence of a contrary legislative intent."); *Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789, 6 Fed.Cir. (T) 121, 125 ("In the absence of evidence to the contrary ... '[t]he meaning of a tariff term is presumed to be the same as its common or dictionary meaning.'" (quoting *Rohm & Haas Co. v. United States,* 727 F.2d 1095, 1097, 2 Fed.Cir. (T) 28, 29 (1984))), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988).

■ To interpret the statute any more restrictively would thwart the broad, general language which we presume was deliberately used by Congress. *Canadian Aviator, Ltd. v. United States,* 324 U.S. 215, 222–26, 65 S.Ct. 639, 643–45, 89 L.Ed. 901 (1945) (refusing to interpret an Act authorizing suits against the United States as narrowly as the government suggested, because "we think Congressional adoption of broad statutory language authorizing suit was deliberate and is not to be thwarted by an unduly restrictive interpretation"). That the language is broad and general in nature does not mean it is ambiguous. To the contrary, the meaning is quite clear—the broad, general language means that its application is broad in scope. Absent the impossible task of having Congress list in the statute every type of repair expense that it intended be encompassed within the statute, the statute could not be any clearer on its face. Hence, this is not a case like *United States v. Marsching,* 1 Ct. Cust. 216, 217–20 (Ct.Cust.App.1911), or *United States v. Wigglesworth,* 28 F.Cas. 595, 596–97 (C.C.D.Mass.1842) (No. 16,690), or *Eidman v. Martinez,* 184 U.S. 578, 590–91, 22 S.Ct. 515, 520–21, 46 L.Ed. 697 (1902), cited by Texaco, where the statutory language was unclear or where an attempt was made to have read into it words which were not there.

Further, the broad "but for" interpretation does not thwart the purposes behind the vessel repair statute. *Cf. United States v. Carbone,* 327 U.S. 633, 637, 66 S.Ct. 734, 736, 90 L.Ed. 904 (1946) (interpreting the Kickback Act more narrowly than its broad literal language "in light of the evils which gave rise to the statute and the aims which the proponents sought to achieve"). To the contrary, the interpretation effectuates the obvious purpose for which Congress enacted the statute.[3] As was stated by one of our predecessor courts, the statute was enacted "to equalize, by imposition of the prescribed duty, the relative costs of repairs performed by foreign versus domestic labor, in order to encourage U.S. ship owners to employ U.S. labor whenever possible." *Mount Washington Tanker Co. v. United States,* 665 F.2d 340, 344 (CCPA 1981); *see also South Corp. v. United States,* 690 F.2d 1368, 1372, 1 Fed.Cir. (T) 1, 5 (1982) ("In enacting § 1466(a) Congress sought to protect and encourage American ship repair facilities."); *Sea–Land Serv., Inc. v. United States,* 683 F.Supp. 1404, 1409 (Ct. Int'l Trade 1988) ("It is evident from the

---

3. Other than the words of the statute that Congress enacted in 1866, we know of no statement made by the 1866 Congress which sheds light upon the purpose behind the statute.

legislative history of 19 U.S.C. § 1466, a revision of section 466 of the Tariff Act of 1930, that the basic purpose of the foreign repair statute was to protect American labor."); *Erie Navigation Co. v. United States*, 475 F.Supp. 160, 163 (Cust.Ct.1979) ("It is clear that the purpose of section 1466(a) was to protect the American shipbuilding and repairing industry."); *United States v. Gissel*, 353 F.Supp. 768, 772 (S.D.Tex.1973) (noting that "it was Congressional policy to encourage the obtaining of American flag vessel repairs in American shipyards"), *aff'd*, 493 F.2d 27 (5th Cir.), *cert. denied*, 419 U.S. 1012, 95 S.Ct. 332, 42 L.Ed.2d 286 (1974). If the repairs involved had been made in a domestic instead of a foreign port, the additional work that the Court of International Trade held was subject to the fifty percent duty on "expenses of repairs" would have been done by American rather than foreign workers. Therefore, subjecting the expenses of that additional work to the fifty percent duty furthers the purpose of the statute.

### B.

Texaco relies heavily upon *United States v. George Hall Coal Co.*, 142 F. 1039 (2d Cir.

1906), in support of its argument that the courts have firmly established that "expenses of repairs" means something more restrictive than the "but for" interpretation warranted by the statute's plain language. Texaco's reliance upon *George Hall Coal* is misplaced. In that case, the United States Court of Appeals for the Second Circuit affirmed a December 31, 1903 unpublished decision of the Department of Treasury Board of General Appraisers (Board).[4] The Board had sustained a protest made by George Hall Coal and had overruled an assessment of the vessel repair duty levied on the expense of drydocking a vessel while the vessel was undergoing dutiable repairs in a foreign port. 142 F. at 1039. Significantly, what is not apparent from any of the published decisions in *George Hall Coal* is the rationale upon which it was determined that the dry-docking expense was not an expense of repair.[5] The rationale was provided, however, in the Board's unpublished decision. There, the Board stated that the dry-docking issue was settled in an earlier unpublished Board decision, rendered on September 13, 1903, in

---

**4.** The no-longer-existent Board of General Appraisers was an administrative unit within the Department of the Treasury. *See* Act of June 10, 1890, ch. 407, § 12, 26 Stat. 131, 136. The Board was responsible for the review of decisions by Customs officials. *Id.* §§ 12–14, 26 Stat. at 136–38. In 1926, as the types of decisions pertaining to import transactions expanded, Congress established the United States Customs Court, as an Article I court, to replace the outmoded Board. Pub.L. No. 69–307, 44 Stat. 670 (1926); *see also* H.R.Rep. No. 1235, at 18, 1980 U.S.C.C.A.N. at 3729–30. The Customs Court gradually became an integral part of the federal judicial system, and in 1956 Congress declared the Customs Court an Article III court. Pub.L. No. 84–703, 70 Stat. 532 (1956); *see also* H.R.Rep. No. 1235, at 18, 1980 U.S.C.C.A.N. at 3729, 3730. As discussed earlier in this opinion, the Customs Court is the predecessor to the present-day Court of International Trade.

At the time of *George Hall Coal*, review of Board decisions could be had in the nisi prius federal circuit courts, Act of June 10, 1890, ch. 407, § 15, 26 Stat. at 138, and then in the courts of appeals, Act of March 3, 1891, ch. 517, § 6, 26 Stat. 826, 828. In 1909, however, exclusive jurisdiction over Board decisions was vested in the newly created Court of Customs Appeals. Tariff Act of 1909, ch. 6, § 28, 36 Stat. 11, 104 (amending Act of June 10, 1890). Then, in 1929, the Court of Customs Appeals' jurisdiction was ex-

panded and its name was changed to the Court of Customs and Patent Appeals (CCPA), Pub.L. No. 70–914, 45 Stat. 1475, 1475–76 (1929). The CCPA was one of our predecessor courts.

**5.** There are three published opinions in *George Hall Coal*. The first is an opinion of the Treasury Department, Treas.Dec. 24932 (Jan. 25, 1904), in which the Department opined that a protest did not lie in cases arising under the vessel repair statute and that therefore the Board was without jurisdiction to review Customs' assessment of a vessel repair duty. *Id.* The Department thus authorized a government appeal of the Board's decision. *Id.* On appeal, the nisi prius United States Circuit Court for the Western District of New York rejected the government's jurisdictional contention, thereby sustaining the decision of the Board. *United States v. George Hall Coal Co.*, 134 F. 1003 (1905), *aff'd*, 142 F. 1039 (2d Cir. 1906). That the Board lacked jurisdiction was the government's sole argument to the circuit court; in other words, the government did not argue that the drydocking expenses were in fact dutiable under the vessel repair statute. *See id.* The Board's decision was then upheld by the Second Circuit, which also rejected the government's jurisdictional argument. *United States v. George Hall Coal Co.*, 142 F. 1039 (1906). Again, the merits of the duty assessment were not before the court. *See id.*

another protest made by George Hall Coal. In the September 13, 1903 decision, the Board reasoned:

> The mere drawing up of a vessel on a dry dock is not a part of her repairs, but is rather a method of making an inspection of her to determine whether any repairs are necessary. The examination might show the hull to be in perfect condition, requiring no attention of any kind.

Copy of Board decision attached to Letter from George Hall Coal Co. to Collector of Customs, Charlotte, N.Y., the letter being dated September 18, 1903.[6] In other words, the Board held that the dry-docking expense was not subject to the vessel repair duty because the Board found that the expense would have been incurred irrespective of whether or not dutiable repairs were performed. Therefore, *George Hall Coal* is entirely consistent with the "but for" interpretation of the statute.

## C.

To the extent that judicial authority not binding upon this court is inconsistent with the "but for" interpretation we clarify today, we are not persuaded thereby to interpret "expenses of repairs" any more restrictively than the plain language of the statute warrants. We note first *American Viking Corp. v. United States,* 150 F.Supp. 746 (Cust.Ct. 1956), wherein the court held that the expense of providing lighting needed to perform a dutiable repair was not dutiable as an expense of the repair. *Id.* at 752. The lighting expense at issue in *American Viking* seemingly would have been an expense of the repair under a "but for" interpretation of the statute. The *American Viking* court, however, read the statute more restrictively, based upon *George Hall Coal.* The *American Vi-*

*king* court relied upon *George Hall Coal* in holding that "[s]ince the cost of a place to do the work is not dutiable as expenses of repairs, neither is the cost for lighting necessary for its performance." 150 F.Supp. at 752. As discussed above, though, *George Hall Coal* does not stand for the proposition that the cost of a place to do the work is not dutiable as expenses of repairs. *George Hall Coal* simply stands for the proposition that expenses that would have been incurred irrespective of whether or not dutiable repairs are performed are not dutiable as an expense of repairs. We therefore decline to place any reliance upon *American Viking.*

We also are not persuaded by either *International Navigation Co. v. United States,* 148 F.Supp. 448 (Cust.Ct.1957), or *Mount Washington Tanker Co. v. United States,* 505 F.Supp. 209 (Ct.Int'l Trade 1980). The holdings in these cases are based upon the same mistaken premise as the holding in *American Viking.* In *International Navigation,* the United States Customs Court held that certain expenses—including expenses to transport a foreign repair crew to and from an anchored vessel being repaired, which expenses the court specifically found were "necessary to perform the work"—were not dutiable as expenses of repairs. 148 F.Supp. at 455. Again, the expenses at issue in *International Navigation* seemingly would have been viewed as coming within the purview of the statute had the court given the statute a "but for" interpretation. The *International Navigation* court, however, analogized the expenses to dry-docking expenses and held that the expenses were not subject to duty. *Id.* Thus, the court stated that in *George Hall Coal* "[e]ven though the vessel had to be placed in drydock in order to be repaired, the expenses therefor were not con-

---

**6.** The December 31, 1903 unpublished Board decision and the September 13, 1903 unpublished Board decision (as an attachment to the September 18, 1903 George Hall Coal Co. letter) are annexed hereto as Attachments A and B, respectively.

Our discussion of these two unpublished decisions is necessitated by (i) the fact that the published opinion of the Second Circuit in *George Hall Coal* affirmed the Board's December 31, 1903 unpublished decision and (ii) by the fact that, as seen below, subsequent decisions of the

Court of International Trade and its predecessor, the Customs Court, have viewed *George Hall Coal* as standing for the proposition that the cost of a place to do work (i.e., a drydock) is not dutiable as an expense of repairs, which in fact it does not. Under these circumstances, our discussion of *George Hall Coal* should not be viewed as a departure from the spirit of Federal Circuit Rule 47.6(b), which states that opinions of this court which are designated as not citable "shall not be employed or cited as precedent."

sidered part of the actual repairs." *Id.* As discussed above though, the Board determined in *George Hall Coal* that the dry-docking expenses were not dutiable because they would have been incurred irrespective of whether or not dutiable repairs were performed, not because the expenses were necessary for the repairs.

In *Mount Washington Tanker*, the Court of International Trade held that certain expenses—namely, compensating the members of a Swedish repair crew for their time spent traveling between Sweden and a vessel anchored at sea off of Singapore—were not dutiable as an expense of the dutiable repairs performed by the repair crew. 505 F.Supp. at 216.[7] The *Mount Washington Tanker* court relied upon *International Navigation*, and also mentioned *George Hall Coal*, and held that expenses "not directly involved in the making of repairs," although "incident to the repairs," are not dutiable as expenses of repairs. *Id.* Seemingly, these expenses too would have been viewed as coming within the statute if the court had used a "but for" approach. Thus, *Mount Washington Tanker*, like *American Viking* and *International Navigation*, was incorrectly decided.

### D.

■ We turn next to Texaco's argument that Customs's assessment of duties on the expenses at issue in this case was improper because it was based upon an interpretation of "expenses of repairs" that was a change in established and uniform practice. Texaco contends that Customs made the change without the required notice in the Federal Register. Texaco's argument is premised upon the notice requirement regarding departures from "established and uniform practice" which appears in 19 U.S.C. § 1315(d). Section 1315 provides in pertinent part:

**(d) Effective date of administrative rulings resulting in higher rates**

No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the Federal Register of notice of such ruling. . . .

19 U.S.C. § 1315(d) (1988).[8] The government does not contest the applicability of the § 1315(d) notice requirement to a ruling such as that in the present case. We note in this regard that 19 U.S.C. § 1498(a)(10) (1988)—which provides that "[t]he Secretary of the Treasury is authorized to prescribe rules and regulations for the declaration and entry of ... [m]erchandise within the [vessel repair statute] (relating to ... repairs ...)"—indicates an intention by the Congress that expenses within the vessel repair statute shall be regarded as merchandise imported into the United States. *International Navigation*, 148 F.Supp. at 453; *Pacific Transp. Lines, Inc. v. United States*, 29 Cust.Ct. 21, 27 (1952).

Texaco asserts that Treasury Decision (T.D.) 39443, 43 Treas.Dec. 99 (1923), established an interpretation of "expenses of repairs" with which Customs' assessment of duties in the present case is inconsistent. Specifically, Texaco contends that in T.D. 39443 the Treasury Department interpreted "expenses of repairs" as covering only those expenses incurred for work directly involved in the actual making of repairs. Texaco argues that under this standard the cleaning expenses and the expenses associated with the protective covering work, that are at issue in this case, are not "expenses of repairs" within the meaning of the statute.

**7.** Part of the decision in this case was appealed by Mount Washington Tanker Company to the CCPA, where the decision was affirmed. *Mount Washington Tanker*, 665 F.2d 340 (1980). However, the issue in the Court of International Trade decision with which we are concerned is not addressed in the decision of the CCPA; thus, an appeal from the decision of the Court of International Trade apparently was not taken by the government.

**8.** Subsection (d) was not affected by the 1993 amendments to § 1315. *See* Pub.L. No. 103–182, tit. VI, § 633, 107 Stat. 2198.

We do not agree that T.D. 39443 established the narrow standard for "expenses of repairs" that Texaco asserts it did. In fact, T.D. 39443 established nothing with respect to the interpretation of "expenses of repairs." At issue in T.D. 39443 was the dutiability under the vessel repair statute of the following expenses: (1) overtime pay for the *domestic* crew of a United States flagged vessel; and (2) the cost of *domestically manufactured* repair materials. 43 Treas.Dec. at 100. The Treasury Department ruled that neither expense was subject to the vessel repair duty. *Id.* The Department held, therefore, "that the words 'expenses of repairs made in a foreign country' as used in [the vessel repair statute] apply only to expenditures made for foreign materials or for foreign labor employed in making repairs." *Id.* This holding was subsequently adopted by Congress, Tariff Act of 1930, Pub.L. No. 71–361, tit. IV, § 466, 46 Stat. 590, 719, and remains in the current version of the statute, which provides that "compensation paid to members of the regular crew of such vessel in connection with . . . the making of repairs, in a foreign country, shall not be included in the cost . . . of such repairs." 19 U.S.C. § 1466(a).

Texaco, however, has seized upon the words "employed in making repairs" used by the Department in T.D. 39443 to argue that the decision established that only those expenses incurred in the actual making of repairs are dutiable. Texaco's reliance upon this language is misplaced. T.D. 39443 does not define the scope of the phrase "employed in making repairs". In other words, the phrase "employed in making repairs" used in the Treasury Department ruling is no less broad than the phrase "expenses of repairs" appearing in the statute. Moreover, the interpretation of the statutory language "ex-

penses of repairs" was not at issue in T.D. 39443 and thus the decision should not be seen as an interpretation of that statutory language. Again, the issue in T.D. 39443 was not the *type* of work performed and its nexus with the underlying dutiable repair; rather, the issue was *who* performed the work—foreign or domestic labor. Thus, T.D. 39443 did not establish the restrictive interpretation of "expenses of repairs" that Texaco contends it did.

Accordingly, we hold that the Court of International Trade properly used a "but for" standard for "expenses of repairs" when it evaluated the expenses at issue in this case. Using that standard, we turn now to the expenses at issue to determine whether they were properly assessed with the vessel repair duty.

### E.

#### 1. *Clean-up Expenses*

■ It is undisputed that "but for" dutiable repairs, the clean-up work, at least in part, would not have been required. As for the clean-up work of invoice item B–27, all the debris removed either resulted from the boiler repairs or was trash left behind by workers making the repairs. Similarly, the item G–2(g) clean-up work was necessitated by debris created by the grit-blasting-and-coating repair operation.[9] Finally, as for item H–29(f) clean-up work, the debris removed was either created by the actual repairs or was trash left behind by workers making the repairs.[10] Accordingly, all of the clean-up expenses at issue come within the statute under a "but for" interpretation.

Under the common meaning of "expenses of repairs," it is plain that the clean-up expenses in this case must be considered to be expenses of the repairs that were made on

9. Although it appears that some cleaning of the cargo tanks to prepare them to carry cargo would have been necessary even if the repairs had not been made, it also is true that all the debris mentioned in the invoice was created by the repairs. In this regard, the invoice does not indicate that the cleaning included the cleaning of the remains of previous cargo. In any event, Texaco has made no effort to separate from the total G–2(g) expenses amounts that would have been incurred to clean the cargo tanks as a

normal maintenance service had the G–2 repairs not been made.

10. Texaco does not contend that the cleaning of the after peak tank would have been necessary even if the repair work had not been performed. In addition, no effort has been made to separate from the total H–29(f) expenses those expenses that would have been incurred to clean the after peak tank as part of normal maintenance.

the GEORGIA. A good analogy is the repair of an automobile. We doubt very much that a person who leaves an automobile at a repair shop for repairs considers the repair job complete if the car is returned with debris from the repair work and trash from the workers strewn about the interior of the vehicle. Such is the nature of the clean-up expenses in this case; therefore, they must be considered "expenses of repairs."

Texaco argues, though, that Customs's assessment of duties on clean-up expenses was a change in established and uniform practice. Texaco relies upon two rulings published in the *Customs Bulletin* in support of its argument. Concededly, one of the rulings, Customs Service Decision (CSD) 80–148, 14 Cust.B. 968 (1980), does support Texaco's argument for holding clean-up expenses to be non-dutiable. The services performed by foreign labor in CSD 80–148 involved cleaning the dock area beside a vessel in order to remove "the vessel's rubbish, empty drums, cables, steel, wire, etc." *Id.* at 968. It appears that these items were what remained after the following dutiable repairs: (1) the installation of a new drive shaft in a winch unit that had failed; (2) the changing of powerpacks on the port and starboard engines; and (3) the installation of a port tow cable. *Id.* Customs ruled that "[t]he cost of cleaning the quay in which a vessel was berthed during the time that repairs were effected to it are not classifiable as repairs under the vessel repair statute...." *Id.* at 969–70. The ruling was based upon a prior unpublished Customs Ruling, Customs Information Exchange (CIE) 18/48 (Jan. 12, 1948), in which "it was held that cleaning which is not preparatory to the making of dutiable repairs is not dutiable under the vessel repair statute." 14 Cust.B. at 969. Customs stated in CSD 80–148 that it was "of the opinion that the cleaning charges [at issue] were not part of the costs of repairs effected to the vessel" and that the charges were "analogous to drydocking charges which were also held to be duty free in CIE 18/48." *Id.*

We cannot say, however, that CSD 80–148 demonstrates a uniform and established Customs practice that *all* clean-up expenses are

non-dutiable. Our review of various unpublished Customs decisions submitted by the parties has revealed that Customs historically has used a broader scope of "expenses of repairs" than is suggested by the ruling in CSD 80–148. Generally, although the specific formulations differ somewhat in form, Customs has analyzed whether an activity is subject to the vessel repair duty by evaluating whether there was a nexus between the underlying dutiable repair work and the expenses at issue. *See, e.g.,* CIE 429/61, at 2 (Apr. 28, 1961) ("[I]tem 4 which pertains to the main steam strainer is purely a cleaning operation which *is not related in any manner* to repairs and is therefore not subject to the [vessel repair duty]." (emphasis added)); CIE 820/60, at 1 (June 9, 1960) ("Cleaning operations actually in preparation for painting are dutiable on the cost thereof as an *integral part* of painting...." (emphasis added)); Customs Service Headquarters Ruling 108112 EA, at 3 (Aug. 21, 1986) ("Cleaning is not a dutiable expense unless *associated with* a repair process." (emphasis added)); Customs Service Headquarters Ruling 101423 BJF, at 3 (Oct. 20, 1976) ("Essentially, if [testing, inspection and cleaning expenses] are *incident to or accompany* repairs, they will be held dutiable; if *conducted without regard to* repairs, they are not dutiable." (emphasis added)).

The other ruling upon which Texaco relies, CSD 81–188, 15 Cust.B. 1103 (1981), also is not helpful to it. In that ruling, Customs held that "charges for the cleaning of cargo tanks of an American-flag vessel in a foreign drydock are dutiable under [the vessel repair statute] when dutiable repairs on the tanks are made following the cleaning." *Id.* at 1104. From this holding, Texaco argues that *only* pre-repair cleaning expenses are dutiable and thus post-repair cleaning expenses are never dutiable. We do not accept this leap in logic, especially in light of the "but for" standard for "expenses of repairs" clarified above.

In sum, the non-dutiability of clean-up expenses was not an established and uniform practice of Customs.

For the foregoing reasons, we affirm the imposition of the vessel repair duty on the

clean-up expenses identified by invoice items B–27, G–2(g), and H–29(f).

### 2. *Expenses Associated with Protective Covering Work*

■ As with the clean-up expenses, it is undisputed that "but for" dutiable repairs, the expenses associated with the protective coverings, set forth in invoice item G–2(f), would not have been incurred. As we have seen, the heating coils were wrapped to prevent the crew performing the grit-blasting-and-coating repairs from coming in contact with and damaging the coils. The cargo lines were covered (i.e., "blanked") to prevent air-borne materials—presumably created by the grit-blasting operation—from entering the openings of the lines and getting the lines dirty. Texaco does not contend that the coils would have been wrapped or that the cargo lines would have been "blanked" even if the dutiable repairs had not been performed. Accordingly, the protective covering expenses at issue come within the vessel repair statute under a "but for" interpretation.[11]

The work effort associated with the protective coverings can be analogized to the labor-intensive effort involved in applying masking tape over areas not to be painted, as a part of an interior house-painting job. The masking tape contributes to a better and more effective paint job and to improving the appearance of the house. Indeed, the masking tape might easily be considered to be as essential to the accomplishment of the paint job as the painting itself. Certainly, the application of the masking tape would be considered a part of the paint job. Similarly, in the present case, the labor to wrap the heating coils and to cover the openings of the cargo lines, which was performed in the cargo tanks, must be considered to be part of the repairs effected to those tanks, and the expenses therefor must be considered as dutiable within the meaning of the statute.

Finally, Texaco argues that the imposition of the vessel repair duty upon the expenses associated with the protective coverings is inconsistent with CSD 83–18, 17 Cust.B. 752 (1982). We disagree. In CSD 83–18, Customs ruled that the expense of stack covers used to protect a vessel's boilers and engine room from rain and snow while the vessel was in port were non-dutiable. The ruling is irrelevant to the present case, however, because there were no underlying dutiable repairs performed in CSD 83–18. The issue before Customs was whether the stack covers were an addition to the ship's equipment within the meaning of § 1466(a), given that they were discarded at the end of the lay-over. Customs did not need to consider whether the stack covers were "expenses of repairs" since no repairs were made on the vessel involved.

Accordingly, we affirm the imposition of the vessel repair duty on the expenses associated with protective coverings identified by invoice item G–2(f).

### CONCLUSION

The judgment of the Court of International Trade is affirmed.

### COSTS

Each party shall bear its own costs.

*AFFIRMED.*

---

11. Texaco's argument that TMSI did not specifically request that Hellenic perform this work and that the work was not absolutely necessary to accomplish the repairs is without merit. First, Texaco paid for the work. Second, whether the work was necessary to accomplish the repairs is not relevant under the "but for" standard for "expenses of repairs."