NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2009-1075

HORIZON LINES, LLC,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Evelyn M. Suarez, Williams Mullen, PC, of Washington, DC, argued for plaintiff-appellant.  With her on the brief was Dean A. Barclay.  Of counsel were George H. Bowles, of Virginia Beach, Virginia, and Robert S. Zuckerman, Horizon Lines, LLC, of Charlotte, North Carolina.

Edward F. Kenny, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellee.  With him on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, of Washington, DC, and Barbara S. Williams, Attorney in Charge, of New York, New York.  Of counsel was Michael W. Heydrich, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Appealed from:  United States Court of International Trade

Chief Judge Jane A. Restani

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2009-1075

HORIZON LINES, LLC,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of International Trade in case no. 05-00435, Chief Judge Jane A. Restani.

_____

DECIDED: August 4, 2009

_____

Before MICHEL, <u>Chief Judge</u>, BRYSON, <u>Circuit Judge</u>, and SPENCER, <u>District Judge</u>.[*]

MICHEL, <u>Chief Judge</u>.

Plaintiff-Appellant Horizon Lines LLC ("Horizon") appeals from a grant of summary judgment by the United States Court of International Trade in favor of Defendant-Appellee United States ("the Government"). <u>See</u> <u>Horizon Lines, LLC v. United States</u>, Slip Ops. 07-172 (Nov. 20, 2007), and 08-109 (Oct. 15, 2008). The trial

---

[*] The Honorable James R. Spencer, District Judge, United States District Court for the Eastern District of Virginia, sitting by designation.

court held that certain expenses incurred by Horizon to lay up its U.S. vessel in Indonesia prior to the commencement of repairs were nevertheless dutiable expenses of repair pursuant to 19 U.S.C. § 1466(a). We heard oral argument on July 8, 2009. Because there are genuinely disputed issues of material fact regarding the causal connection, if any, between costs of the lay-up in Indonesia and costs of subsequent repair work that began eighty-three days later in Singapore, the trial court's grant of summary judgment is <u>reversed</u>, and the case is <u>remanded</u>.

## I. BACKGROUND

Horizon operates container ships, and has five that regularly travel between the continental United States and Puerto Rico. In late 2001 Horizon pulled one of these five ships, the <u>Crusader</u>, off Puerto Rico duty to work Horizon's trans-Pacific route for two voyages. On July 5, 2001, <u>Crusader</u> picked up empty cargo containers from South Carolina and Florida and on July 24, 2001, delivered them to Hong Kong. <u>Crusader</u> then sailed to Tacoma, Washington, and returned with cargo to Hong Kong on September 4, 2001.

From September 7 through November 28, 2001, Horizon sent <u>Crusader</u> to lay up in Indonesia at the Karimun Sembawang Shipyard ("KSS"). Horizon's decision to lay up <u>Crusader</u> at KSS is discussed in an e-mail exchange. On August 21, 2001, Horizon's Glen Moyer stated:

> Our plan is now to send [<u>Crusader</u>] to Singapore after stripping her of cargo in Hong Kong. We will take her to an anchorage at an island just off Singapore that has an anchorage and small shipyard under Jurong S[hipyard]'s management. We will then have Jurong move the ship under tow (few hours) to their yard to fit her into a schedule that fits them. This will reduce the time we need to lay at anchor. We have given them an absolute return to us date of Jan 4 . . . .

This plan differs from what was originally agreed upon by not doing the quick and dirty dry-docking. We felt that the better impact on 2001 P&L was to delay any docking until latest to meet Jan return date.

J. 203. Two hours later, Horizon's Joe Breglia confirmed this plan:

After much debate and hard work we have come to the conclusion that the best location for [Crusader] is to have her lay idle at [KSS] in Indonesia. We have requested that the agreement for the protection and safety of the vessel be made between [Horizon] and [Jurong Shipyard], and have asked that they assist in the coordination of this lay up.

. . . .

Our current plan would be to lay the vessel idle at [KSS] for (2) months, with the vessel then shifting to [Jurong Shipyard] in early Nov to commence a longer than usual repair period. We would work towards having the [Crusader] depart the yard at or around the 1st week of Jan 2002.

J. 205.

On November 29, 2001, a tug towed Crusader from KSS to Jurong Shipyard in Singapore ("Jurong"). From December 7 to December 15, 2001, Crusader was dry-docked and underwent repairs and inspections at Jurong. Repairs and mandatory inspections were completed December 15, 2001, after which Crusader returned to regular service.

Documentary evidence indicates that Crusader was due for inspections by August 31, 2001, or would have to be taken out of service pending completion of inspections. At least by December 2000, Horizon was trying to schedule dry-docking to meet this deadline. In June 2001, Horizon requested an extension to September 25, 2001, of the inspection deadline. Such extensions of up to six months are routinely granted. The inspections, however, were held in abeyance due to Crusader's lay-up.

In January 2002, Crusader returned to the United States.  Customs imposed duties on the Jurong repair work (and Horizon does not contest the duties on this repair work).  Customs also considered part of the KSS lay-up cost a repair expense and imposed a duty on that part.  The duties totaled over $800,000.

Horizon filed an administrative protest with Customs which resulted in the reduction of Horizon's lay-up duties by about $300,000.  Customs issued a decision determining, item by item, which lay-up expenses were dual-purpose and therefore subject to duties apportioned to the repair work.  Horizon filed suit in the United States Court of International Trade, seeking a full refund of all duties on the KSS lay-up.  Horizon's expert, James Dolan, examined the lay-up invoices and testified that none of the lay-up work advanced the repair work done at Jurong.

The trial court, however, granted the Government's motion for summary judgment.  Despite Horizon's evidence that inspection issues and seasonal decline in trade were the considerations prompting the lay-up decision, the trial court held that Horizon did not point to evidence suggesting that the lay-up was in no way prompted by Horizon's desire to conduct repairs at Jurong.  Without such evidence, the trial court concluded "that there is no genuine issue of material fact that the Crusader was laid up in KSS, at least in part in anticipation of a 'longer than usual repair period' at Jurong." A. 7.

Horizon appealed.  We have jurisdiction under 28 U.S.C. § 1295(a)(5).

## II.   DISCUSSION

We review the Court of International Trade's grant of summary judgment de novo.  Int'l Trading Co. v. United States, 412 F.3d 1303, 1307 (Fed. Cir. 2005).  We

review summary judgment for correctness as a matter of law, deciding de novo (i) the proper interpretation of the governing statute and regulations; and (ii) whether genuine issues of material fact were raised by the evidence offered to oppose summary judgment. Id.

At summary judgment, all facts and inferences must be construed in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Summary judgment is only appropriate if no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. Id. The sole issue in this appeal is whether material issues of disputed fact were raised by Horizon's witnesses as to whether the KSS lay-up expenses were "expenses of repairs" under 19 U.S.C. § 1466(a).

U.S.-flag vessels repaired in a foreign country are, under § 1466(a), subject to a duty on the value of such repairs upon return to the United States. The statute states, in relevant part:

> The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country.

§ 1466(a) (emphasis added).

The parties agree that in Texaco Marine Services v. United States we held that the proper analysis for whether an item of work is an "expense of repair" under § 1466(a) is a "but for" test; i.e., "expenses of repairs" includes "all expenses (not specifically excepted in the statute) which, but for dutiable repair work, would not have

been incurred." 44 F.3d 1539, 1544 (Fed. Cir. 1994). The "but for" test has an admittedly broad sweep, but this is as Congress intended. Id. However, this "but for" test applies only to "single-purpose" expenses. SL Serv. v. United States, 357 F.3d 1358, 1360-61 (Fed. Cir. 2004). For a "dual-purpose" expense—an expense necessary to both dutiable repair work and other non-dutiable work—the portion of the expense "that is fairly attributable to the dutiable repairs" is subject to duties under § 1466(a). SL Serv., 357 F.3d at 1362.

The Government argued that the two e-mails referenced above conclusively show that the anticipated repairs at Jurong caused the KSS lay-up. The e-mails, however, are ambiguous and do not conclusively establish a causal connection between the decision to lay-up at KSS and the repairs that started eighty-three days later at Jurong, aside from the fact that Horizon was scheduling these two events around the same time and both through Jurong (which owned the lay-up site). Nothing in the e-mails indicates that lay-up at KSS was necessary to or facilitated repairs at Jurong. The Government's case rests on speculation that Crusader had to stand by near the Jurong repair yard. But the actual stand-by time was one week in early December, not the nearly three months of the lay-up period. Secondly, if laid up at a US site, Crusader would have been relocated to Jurong in certainly less than eighty-three days.

Conversely, Horizon presented evidence of three witnesses that the lay-up at KSS was caused entirely by factors other than the scheduled Jurong repairs. James Dolan explained in his deposition that "any lay-up . . . I have been involved with has been simply a commercial decision . . . the market goes bad for some reason and

vessels lay-up. . . . So, it is just a commercial thing.  If you don't have work for the vessel, then you lay it up."  J. 132.  Horizon's port engineer, Joseph Walla's testimony that a lay-up "always depends on the cargo" supports Horizon's argument that Crusader had to be taken out of service simply due to a lack of cargo.

Horizon thus presented the trial court with considerable testimony that directly contradicted the Government's theory based solely on its reading of two ambiguous e-mails.  Horizon's employee, Walcott Becker testified,

> The lay-up was necessary because we were going to lay [Crusader] up anyhow.  It wasn't sent out there just [to await a scheduled slot to dry-dock the vessel at the Jurong Shipyard].  We were planning on going to the Jurong Shipyard, but, I mean, we could have just as well laid the ship up on the East Coast as out in Asia.

J. 177.  Similarly, Joseph Walla stated, "The timing of Horizon's selection of a repair contractor did not causally, logically or temporally relate to the timing of Horizon's selection of a lay-up facility."  In addition, he said that, "[t]he timing of the CRUSADER's lay-up did not causally, logically or temporally relate to the ability of Jurong's schedule to accept the CRUSADER for repairs" or "relate to Horizon's receipt of a dry-dock survey extension."  J. 931.  Horizon requested a survey extension in June 2001, approximately two months before Horizon decided to lay up Crusader at KSS, and the Government has shown no evidence of a connection between the extension and lay-up.

The Government also argues that many lay-up costs should be considered repair expenses because without having Crusader inspected, Horizon would have had to remove Crusader from service by September 25, 2001.  Horizon, however, was entitled to a six-month dry-docking survey extension, and could have requested three more months from late September, which would have covered the entire lay-up period.

Horizon presented evidence that requesting an additional extension was unnecessary due to commercial inactivity. There is also evidence suggesting that the lay-up was inevitable and, as Walcott Becker explained, Crusader was "laid up for a long time . . . we weren't waiting 83 days to get into the dry dock." J. 177.

Horizon's evidence suggests that Crusader laid up at KSS because of a variety of reasons, including seasonal considerations and the company's contractual obligation to transport empty containers to Hong Kong. Joseph Walla testified that cargo volume cycles in the Puerto Rican trade were down in September 2001 when Crusader laid up. James Dolan's affidavit explains the particulars of the Puerto Rican market stating, "Horizon Lines will lay-up one of these vessels [when all five vessels are not required by the trade] either in the United States or in a foreign location, depending upon a number of considerations, such as a pre or post-positioning or available safe anchorage or berths." J. 938.

James Dolan's opinion that because of the Hong Kong voyage, "[o]nce the vessel was located in the Far East . . . it was commercially reasonable and logical for the company to lay-up the vessel at a nearby location" provides evidence of an alternative to the Government's supposition of a causal relationship between the lay-up at KSS and repairs at Jurong. See J. 939. In addition, James Dolan stated that "[the lay-up] charges are not repair-related but necessitated by the 'Guide' or normal practice in putting a vessel in lay-up." J. 941. The Guide for Lay-up and for Reactivation of Laid-up Ships ("Guide") is published by the American Bureau of Shipping to assist ship owners in effectively and properly laying up and reactivating their vessels. In short,

Horizon presented evidence which put into genuine evidence-based dispute the factual predicate for the Government's summary judgment motion.

The Government erroneously implies that the two ambiguous e-mails referenced above conclusively prove a causal connection between Crusader's lay-up in Indonesia and Crusader's repairs in Singapore. As evidenced in Glen Moyer's e-mail, Crusader was to anchor at an island off of Singapore under Jurong's management. Jurong would then move the ship to its yard. Horizon made a business decision to delay docking at Jurong until Crusader's January return date. Joe Bregalia's e-mail further delineates the plan "to lay the vessel idle at [KSS] for (2) months, with the vessel then shifting to [Jurong] in early Nov to commence a longer than usual repair period." J. 205. This evidence shows that Horizon scheduled the lay-up and repair work together, but it does not conclusively establish that the repairs caused the lay-up or that the lay-up furthered the repairs.

Horizon laid Crusader up for approximately three months. Crusader was then towed to Jurong's shipyard for one week of dry-docking and repairs. It cannot be implied that Crusader laid up for eighty-three days in anticipation of repairs at Jurong. The e-mails can be read as providing only evidence of scheduling and logistics. The mere coordination of Crusader's lay-up and repairs does not mean one furthers the other.[1] To imply such a connection on this record violates the standard that on summary judgment, all inferences are to be drawn in favor of the non-movant.

---

[1] X may be efficient to coordinate lunch plans with Y and a trip to the dry cleaner so that X only has to leave work once in the middle of the day. However, if X e-mails Y at noon so that X can drop off trousers at the dry cleaner, that would not conclusively prove that the lunch at half past noon caused the trip to the dry cleaner.

CONCLUSION

Horizon's evidence suggesting that the KSS lay-up was entirely unrelated to the Jurong repairs makes improper the trial court's grant of summary judgment in favor of the Government. We therefore reverse the summary judgment grant and remand for further proceedings.